643 A.2d 61

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Darryl John CARTER, Appellant.**

Supreme Court of Pennsylvania.

Argued May 5, 1993.

Decided April 8, 1994.

Reargument Denied Aug. 10, 1994.

240

Thomas G. Parisi, Reading, for appellant.

Mark Baldwin, Dist. Atty., Narcy L. Hughes, Asst. Dist. Atty., Carolyn Daringer, Reading, for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

## *OPINION*

MONTEMURO, Justice.

Appellant Darryl Carter was convicted by a jury of two counts of murder in the first degree for which he received a sentence of life imprisonment and a sentence of death respectively. This direct appeal followed pursuant to 42 Pa.C.S.A. § 9711(h) and Pa.R.A.P.1941.

Although appellant does not challenge the sufficiency of the evidence, in all capital cases we are required to determine whether the quantity of evidence presented was sufficient to sustain the conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In undertaking such a review, we are required to examine all of the evidence, and all reasonable inferences therefrom in a light most favorable to the Commonwealth as verdict winner, and to determine whether there is sufficient evidence to enable the jury to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Bryant*, 524 Pa. 564, 567, 574 A.2d 590, 592 (1990).

Under Pennsylvania law, first degree murder is an intentional killing. *See* 18 Pa.C.S.A. § 2502(a)[1]. As defined

1. § 2502. **Murder**

by common law, first degree murder is accompanied by a specific intent to kill and deliberation or premeditation. *Commonwealth v. Garcia,* 505 Pa. 304, 479 A.2d 473 (1984). The requirements of premeditation and deliberation are met whenever there is a conscious purpose to bring about death. *Commonwealth v. O'Searo,* 466 Pa. 224, 352 A.2d 30 (1976).

■ Drawing all inferences favorable to the Commonwealth, we find that the evidence presented at trial was sufficient for the jury to conclude beyond a reasonable doubt that the appellant murdered both Miller and Brightbill.

On March 7, 1987, appellant and Jonathan Bortz were at the residence of Rodrigue Miller using illegal drugs. (N.T. 7/11–15/88 V.II pp. 534–39). Appellant and Bortz left Miller's residence and returned to Bortz' apartment. *Id.* at 548. Later, Bortz contacted Miller to see if he could obtain any drugs; Miller told Bortz he had no more drugs. *Id.* at 549.

Appellant and Bortz had planned to "set up" Miller and steal any drugs found in Miller's possession. *Id.* at 550. With this plan in mind, appellant continued to contact Miller who finally agreed to give appellant a ride to a place where the appellant could obtain drugs. *Id.*

Miller picked up appellant and Bortz and took them to a trailer where the appellant arranged with the trailer's occupant to make a drug transaction near a specified dam. *Id.* at 552. Miller then drove appellant and Bortz to the dam. Miller and the appellant were in the front seat; Bortz was in the rear seat. *Id.* at 553. After parking for several minutes, appellant shot Miller in the neck. *Id.* at 552. Appellant and Bortz then placed Miller's body in the trunk of the automobile. *Id.* at 555. Appellant and Bortz drove to appellant's home, and changed clothes. They then purchased some gloves and wiped down the car to remove fingerprints. *Id.* at 562. Bortz reloaded the gun. *Id.* at 565–71. The two then bought beer

(a) **Murder of the first degree,**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

and drove aimlessly until they finally stopped on Skyline Drive in Reading. *Id.*

At approximately 3:00 a.m. on March 8, 1987, appellant and Bortz parked next to a car occupied by Juaniata Anderson and Glen Brightbill. *Id.* at 571. The two men approached the car, and ordered its occupants out. *Id.* at 369. When Brightbill asked why they were being ordered get out of the car, appellant and Bortz responded that they were police officers. *Id.* at 370. Brightbill, refusing to comply, moved back into the driver's seat and started the car when appellant opened fire wounding both occupants, Anderson seriously and Brightbill fatally. *Id.* at 371–72. After discharging all of his bullets, appellant reached into the car and began striking Brightbill in the head until Brightbill lost consciousness. *Id.* at 372. Anderson then climbed on Brightbill's lap and attempted to drive to safety; however, Anderson lost control and the car crashed. *Id.* at 375. Although Anderson survived the attack, Brightbill later died of his injuries. *Id.* at 421.

We find this evidence sufficient to support a conviction of first degree murder. The record reflects that the appellant had a conscious purpose to bring about death in the killing of both Miller and Brightbill.

Appellant contends that he was illegally arrested when the police entered his home without a warrant and brought him to Reading City Hall for questioning. Appellant further contends that his conviction should be reversed because of this illegal arrest.

The Pennsylvania State Police went to appellant's trailer for the purpose of questioning him about the murders committed on Skyline Drive. After knocking on the door of appellant's trailer and announcing their presence, the police heard movement at the door and saw a figure in the window. The police continued to knock for approximately two minutes before the door was opened by appellant's girlfriend, Cindy Staver, who permitted police to enter the premises to search for appellant. Three officers entered, while three remained outside. Inside the trailer, the officers forced open a locked closet door and

246

found appellant, who explained that he was "tripping". The police drew their guns, removed appellant from the closet, and placed him in handcuffs. After consenting to accompany police to City Hall and being given *Miranda* warnings, appellant admitted to drinking and ingesting drugs the previous evening with Miller and Bortz. Appellant asked if Miller had overdosed on drugs, to which police responded that Miller had been murdered. Appellant told police that if he was a suspect in the murder, he wanted an attorney. He was informed that he could call an attorney, at which time appellant became ill and was taken to the hospital.

First, we agree with the appellant that he was arrested in his trailer by the police. An arrest is accomplished by any act that indicates an intention to take the individual into custody and subjects him to the actual control and will of the person making the arrest. *Commonwealth v. Farley*, 468 Pa. 487, 364 A.2d 299 (1976); *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304, *cert. denied*, 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963). When a person is actually restrained of his freedom by the police and taken into custody, an arrest has occurred. *Farley*, 468 Pa. at 495, 364 A.2d at 302. Whether an arrest has been made is viewed in light of the reasonable impression conveyed to the person subjected to the seizure rather than in terms of the subjective views of the police officer making the arrest. *Commonwealth v. Holmes*, 482 Pa. 97, 393 A.2d 397 (1978); *Commonwealth v. Benson*, 280 Pa.Super. 20, 421 A.2d 383 (1980).

In the instant case, Pennsylvania State Police officers entered the appellants home with their guns drawn. They ordered the appellant out of the closet. When he refused, they attempted to open the closet door by force. After the door opened, the officers immediately placed the defendant in handcuffs. The officers then took the appellant to City Hall for questioning. We find that, under the facts of this case, once the police entered the appellant's home and placed him in handcuffs, he was under the actual control of the police. At that point, the appellant was actually restrained of his freedom

by the police and firmly in police custody.[2] We also find that it was reasonable for the appellant, in handcuffs and physically held by officers with guns drawn, to believe that he was under arrest and had to accompany the police to City Hall for questioning. Although the officers believed that the appellant was free to decline to accompany them to City Hall, the subjective views of the police are not controlling. *See Holmes* 482 Pa. at 110–111, 393 A.2d at 403.

▮▮▮▮▮ It is well settled that absent exigent circumstances, an arrest warrant supported by probable cause is required to arrest an individual in his home. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Having found an arrest, the defendant urges us to apply the test this court set forth in *Commonwealth v. Williams,* 483 Pa. 293, 396 A.2d 1177 (1979), *cert. denied,* 446 U.S. 912, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980) to find that no exigent circumstances existed and, therefore, to conclude this warrantless arrest was illegal.[3] We decline to engage in the *Williams* analysis to determine whether the police validly arrested the appellant in his home without a warrant because, even assuming *arguendo* that the arrest of the appellant was illegal, the appellant is not entitled to the remedy he is requesting. The remedy for a violation of the Fourth Amendment is exclusion of all evidence that is the fruit of that violation. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081

**2.** We, of course, do not hold that every time the police place an individual in handcuffs that individual has been arrested. We merely find that under the facts of this case where (1) there has been a warrantless entry into the appellant's home; (2) the police forced the appellant out of a closet (3) the police placed the appellant in handcuffs; and (4) the police held the appellant at gunpoint the appellant was clearly under the actual control of the police and could reasonably believe that he was arrested.

**3.** In *Williams,* we held that a warrantless arrest of an individual in his home was legal where the police had probable cause at the time of the arrest and where there were exigent circumstances. Exigent circumstances were defined by weighing the following factors: (1) the gravity of the offence; (2) whether the suspect is reasonably believed to be armed; (3) whether there is strong reason to believe the suspect is within the premises being entered; (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended; (6) whether the entry was peaceable; and (7) the time of the entry.

(1961) ("We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court.") However, an illegal arrest is not a bar to subsequent prosecution nor a defense to a valid conviction. *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). This court has held that "the mere fact that the arrest of an accused person is unlawful is of itself no bar to a prosecution as a subsequent indictment." *Commonwealth v. Krall,* 452 Pa. 215, 219, 304 A.2d 488, 490 (1973).

In the present situation, the appellant asks us to reverse his conviction because his arrest was illegal. Clearly he is not entitled to this remedy even if we were to find his arrest illegal. As the court in *Crews* held, "[The Appellant] is not himself a suppressible fruit, and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct." *Crews,* 445 U.S. at 474, 100 S.Ct. at 1251. Appellant's remedy is the suppression of the evidentiary fruits of the illegal arrest, not dismissal of the charges.[4] Here, there was no evidence introduced at trial that was obtained as a result of the illegal arrest. As such, appellant is not entitled to any relief.

Appellant next contends that the trial court wrongly denied his petition for change of venue or venire.[5]

**4.** Appellant argues that *Commonwealth v. Wagner,* 486 Pa. 548, 406 A.2d 1026 (1979), stands for the proposition that charges must be dismissed where there is an illegal arrest. The charges against the defendant in *Wagner* were dismissed after the court found an illegal arrest. However, there, the defendant was convicted of aggravated assault of a police officer. There a lawful arrest was an essential element of the crime. Absent those particular circumstances, dismissal of charges is not the appropriate remedy for an illegal arrest.

**5.** Pa.R.Crim.P. 312(a) provides:

(a) All motions for change of venue or venire shall be made to the court in which the case is currently pending. Venue or venire may be changed by that court when it is determined after hearing that a fair and impartial trial cannot otherwise be had in the county where the case is currently pending.

█ The grant or denial of a change of venue is a matter within the sound discretion of the trial judge, who is in the best position to assess the community atmosphere and judge the necessity for a venue change. *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985). The trial court's exercise of discretion will not be disturbed by an appellate court in the absence of an abuse of discretion. *Commonwealth v. Romeri,* 504 Pa. 124, 470 A.2d 498 (1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984).

█ Normally, one who claims that he has been denied a fair trial because of pre-trial publicity must show actual prejudice in the empaneling of the jury. *Commonwealth v. Casper,* 481 Pa. 143, 392 A.2d 287 (1978). However, in certain cases, pre-trial publicity can be so pervasive and inflammatory that the accused is relieved of his burden of proving actual juror prejudice. *Commonwealth v. McCullum,* 529 Pa. 117, 602 A.2d 313 (1992). Pretrial publicity is presumed to be prejudicial if: (1) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual and objective; (2) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or re-enactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports. *Id.* at 126, 602 A.2d at 317.

In the instant case, the appellant alleges that there was such prejudicial pretrial publicity as to require a change in venue. The record presented by the appellant does not reveal the extent of the pretrial publicity aside from general allegations that it was inflammatory and prejudicial. The only specific instances presented by the appellant are the March 9, 1987 editions of the Reading Times and the Reading Eagle with the front page headlines "Murder Suspect Served Jail Time for 1978 Slaying."

█ We find that the appellant is entitled to a presumption of prejudice because this pretrial publicity revealed his past criminal record. *See Id.* However, our cases have consistently held that where there is a "cooling off" period

between the publicity and the impaneling of the jury dissipating its effect, the defendant is not entitled to a change in venue. *See, e.g., Commonwealth v. McCullum,* 529 Pa. 117, 127, 602 A.2d 313, 318 (1992) (Nine month period between publication of prejudicial newspaper articles and trial dissipated publicity); *Commonwealth v. Holcomb,* 508 Pa. 425, 445, 498 A.2d 833, 843 (1985) (Six month period between prejudicial information and trial sufficient to dissipate publicity).

In the present case, there was a fifteen month "cooling off" period between the prejudicial articles and the jury selection. The prejudicial articles revealing the appellant's previous conviction were published on March 9, 1987. The jury selection began on June 15, 1989. The trial court found that this was a sufficient cooling off period to dissipate the prejudicial nature of the publicity. *See* Opinion, Judge Thomas J. Eshelman, May 24, 1991 at 14. Based on the facts of this case and our precedents, we agree with the Honorable trial court judge that fifteen months was sufficient. Thus, we conclude that the trial court did not abuse its discretion in refusing to grant a change in venue.

In a related issue, appellant also claims that the trial court erred in failing to sequester the entire jury panel during voir dire, or to issue a gag order to the press. In this claim, appellant is again advancing the notion that pre-trial publicity prejudiced him. As discussed *supra* in the change of venue issue, this assertion is meritless.

Appellant also contends that his right to a speedy trial was violated. Under Pa.R.Crim.P. 1100(a)(2), trial for an incarcerated defendant must start no later than 180 days from the date on which the complaint is filed.[6] Appellant asserts that his right to a speedy trial as guaranteed by this rule was violated.

6. **RULE 1100. PROMPT TRIAL**
 (a) * * * *
 (2) Trial in a court case in which a written complaint is filed against the defendant, where the defendant is incarcerated, shall commence no later than one hundred eighty (180) days from the date on which the complaint is filed.

 While conceding that pre-trial delay was caused by continuances that he requested, appellant nonetheless attributes this delay to the prosecution, arguing that the prosecution's failure to provide discovery forced him either to request a continuance, or risk being unprepared for trial. However, when appellant requested a continuance he never advanced lack of discovery as a justification. Thus, the record does not support his claim for relief.

Appellant next alleges that the trial court erred in dismissing a juror. On July 11, 1988, the date on which trial was to commence, juror Pamela Byers did not appear for jury duty. On that date the court administrator was advised by Ms. Byers' treating physician that as a result of a drug which he had prescribed, Ms. Byers would be prohibited from driving, and would otherwise make an unreliable juror. Further, the trial court was informed by the prosecution that a key witness would be leaving shortly for Europe on vacation, and that the prosecution would thus be prejudiced by any delay. To resolve this dilemma, the trial court moved the first alternate into the position occupied by Ms. Byers.

 The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Commonwealth v. Black*, 474 Pa. 47, 376 A.2d 627 (1977). This discretion exists even after the jury has been impanelled and the juror sworn. *Commonwealth v. Saxton*, 466 Pa. 438, 353 A.2d 434 (1976). A judge may permanently exempt a juror where that juror shows undue hardship or extreme inconvenience. *See* 42 Pa.C.S.A. § 4503(a)(3).[7]

7. **§ 4503. Exemptions from jury duty**

(a) **General Rule.**—No person shall be exempt or excused from jury duty except the following:

\*　　\*　　\*　　\*　　\*　　\*

(3) Persons demonstrating to the court undue hardship or extreme inconvenience may be excused permanently or for such a period as the court determines is necessary, and if excused for a limited period shall, at the end of the period, be assigned to the next jury array.

 We hold the trial court judge's decision to dismiss Ms. Byers a proper exercise of discretion. The record shows that Ms. Byers was being treated with a drug called Ativan that prevented her from driving and would make her an unreliable juror. *See* Opinion, Judge Thomas J. Eshelman, May 24, 1991 at 19. We find that the trial court could properly conclude that, due to Ms. Byers' medical treatment, it would be an extreme inconvenience for her to participate as a juror and that Ms. Byers was, in fact, unsuitable to serve as a juror. Further, it would have been imprudent to wait for Ms. Byers to regain her health because an important witness for the prosecution would be leaving the next day for Europe.

 Appellant argues that he would have challenged the alternate juror for cause or by exercise of a preemptory challenge. A defendant is entitled to a fair trial and a fair tribunal. *Black* 474 Pa. at 56–57, 376 A.2d at 632 (citing *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). However, a defendant is not entitled to the services of any particular juror. *Id.* 474 Pa. at 57 n. 9, 376 A.2d at 632 n. 9. We find that the defendant was not entitled to the services of Ms. Byers and has not provided any evidence that this was anything other than a fair tribunal.

Appellant asserts that this situation is analogous to the situation presented in *Commonwealth v. Saxton.* In *Saxton,* the trial court judge *sua sponte* removed a juror on the fourth day of the trial. The trial court judge claimed he observed the juror "yawning," "slouching down in her seat," and "shielding her eyes from the light." *Id.* 466 Pa. at 441, 353 A.2d at 435. The trial court judge concluded that, based on his experience as a judge in "Drug Court" and the observations of a physician in attendance, the juror "displayed every indicia of being an addict." *Id.* We found that the trial judge did not present any evidence that the juror was unsuitable and, therefore, exceeded his discretion in removing her from the jury. Today, we hold the present case distinguishable from that presented in *Saxton.* Here, the trial court judge did not remove a juror *sua sponte* from the jury in the middle of the trial based on his personal observations. Instead, the trial court

excused the juror from the jury prior to the beginning of the trial on the advice of the juror's personal physician.

Appellant next challenges the trial court's refusal to suppress his in court identification by the victim, Juaniata Anderson, whose recognition of him appellant alleges to have been tainted by her review of a newspaper article containing his picture two days after the murders.

■ This Court has recognized that identifications made only after a witness has seen the defendant in the media might prove to be suggestive. *See Commonwealth v. Porter*, 524 Pa. 162, 569 A.2d 942, *cert. denied*, 498 U.S. 925, 111 S.Ct. 307, 112 L.Ed.2d 260 (1990). Accordingly, we find Ms. Anderson's positive identification of the appellant after seeing his picture in the newspaper an "impermissible suggestive identification."

■ The problem with an impermissible suggestive identification is the potential for misidentification, resulting in a due process violation if that identification is admitted at trial. *Commonwealth v. Silver*, 499 Pa. 228, 452 A.2d 1328 (1982); *Commonwealth v. McGaghey*, 510 Pa. 225, 507 A.2d 357 (1986). Following a suggestive pre-trial identification, a witness will not be permitted to make an in-court identification unless the prosecution establishes by clear and convincing evidence that the identification was not induced by events occurring between the time of the crime and the in-court identification. *Commonwealth v. Rodgers*, 472 Pa. 435, 372 A.2d 771 (1977). Thus, an in-court identification following a suggestive out of court identification will be admissible only if, considering the totality of the circumstances, it is determined that the in-court identification had an origin sufficiently distinguishable to be purged of the primary taint. *Commonwealth v. Glover*, 488 Pa. 459, 412 A.2d 855 (1980) (quoting *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)).

■ In determining whether an independent basis for identification exists, we must consider the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the

accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Commonwealth v. James,* 506 Pa. 526, 486 A.2d 376 (1985). Our scope of review limits our consideration to a determination of whether sufficient evidence has been presented to support the independent basis for the in-court identification. *Commonwealth v. Davis,* 491 Pa. 363, 421 A.2d 179 (1980).

Upon reviewing the record in light of the factors listed in *James,* we hold that Ms. Anderson had sufficient independent basis for her in-court identification to purge the taint of the suggestive pre-trial identification.

We find that she had ample opportunity to view the appellant at the crime scene. Ms. Anderson testified that she could see her assailants. (N.T. Pretrial Hearing 1/28/88 at 55). The attack lasted "minutes" (N.T. 7/11–15, 1988 V.II at 383) giving her sufficient time to view and identify the appellant. Ms. Anderson further testified that she was in the passenger seat when she saw the appellant look into the driver side window of the car (N.T. V.II at 369). Thus, the appellant was only a few feet away when she had the opportunity to view his face from the passenger seat. (N.T. Pretrial Hearing at 60). The appellant has made much of the fact that there were no lights on Skyline Drive where the attack occurred. (N.T. V.II at 383). We recognize that the crime scene was not well lit. However, we find that the record demonstrates that Ms. Anderson had the opportunity to see the appellant despite the admittedly poor lighting.

Ms. Anderson also gave accurate and consistent descriptions of the appellant to the police immediately after the attack although she had been seriously injured and was in shock because of the incident. Ms. Anderson testified at trial that she had described her assailant to the police as "about 5' 11, 180 pounds, white, he didn't have real long hair." (N.T. V.II. at 380). This testimony was corroborated by Officer Susan Lengle who testified that Ms. Anderson described her assail-

ant as "a white male, late 20's with medium brown hair." (N.T. V.II at 397). Officer Lengle placed Ms. Anderson's description in her report of the incident. *Id.* Later, in the hospital, while medicated, Ms. Anderson was able to tell Corporal Albert J. Spear of the Lower Alsace Township police that her assailant was "a tall dark-haired male." (N.T. V.II at 635). We find the descriptions Ms. Anderson gave to the police immediately after the attack consistent with her in-court identification and evidence that she could identify the appellant from his presence at the crime scene.

It is true that Ms. Anderson was unable to identify her assailant the day after the attack from a photographic line-up. (N.T. V.II at 385). However, Ms. Anderson testified that she could not make an identification because she was ready to go into surgery and was under the influence of medication. (N.T. V.II at 386). Under the circumstances, we find this a credible explanation for her failure to identify the appellant when presented with the photographic line-up.

Furthermore, we are convinced of the certainty of Ms. Anderson's identification. Ms. Anderson testified without hesitation that she saw the faces of her assailants. (N.T. V.II at 378). She then testified that she was "certain" of the identities of the individuals who were outside of the car. *Id.* She also testified that she could identify the appellant prior to having seen his picture in the paper. (N.T. V.II at 392).

We thus conclude that Ms. Anderson did indeed "crystalize" her identification of the appellant as a result of the assault and not as a result of the newspaper photograph. *See Commonwealth v. James,* 506 Pa. at 533, 486 A.2d at 380.

▉▉▉ Appellant also complains that the trial court erred in denying his motion to sever the two murder charges. The decision to grant or deny a motion to sever offenses is vested in the sound discretion of the trial court, whose exercise of such discretion will only be reversed on appeal for manifest abuse. *Commonwealth v. Lark,* 518 Pa. 290, 543 A.2d 491 (1988). Where the defendant moves to sever offenses not based on the same act or transaction, but which have been

consolidated in a single indictment or information, the trial court must determine:

> [W]hether the evidence of each of the offenses would be admissible in a separate trial for the other; whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Lark,* at 302, 543 A.2d at 497 (1988).

■ There is no contention that the evidence of each offense was inadmissible, because the evidence of each offense was relevant to show motive, intent, identity, and as well, demonstrated the history and natural development of the facts. Appellant also does not, and cannot contend that the jury was incapable of separating the two offenses, since the two different sentences imposed clearly contradict such a claim. Instead, appellant insists that he was unduly prejudiced by the consolidation. *See* Pa.R.Cr.P. 1128. As we explained in *Lark,*

> The "prejudice" of which Rule 1128 speaks is not simply prejudice in the sense that appellant will be linked to the crimes for which he is being prosecuted ... The prejudice of which Rule 1128 speaks is, rather, that which would occur if the evidence tended to convict appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating evidence or could not avoid cumulating the evidence.

*Lark,* at 307–8, 543 A.2d at 499.

As in *Lark,* The crimes which were tried together were inextricably linked by appellant's own actions. We find no abuse of discretion in the trial court's decision not to disentangle them.

Appellant next questions the trial court's denial of appellant's motion to provide various experts in the fields of toxicology, neurology, statistics, jury selection, and sociology/criminology. Specifically, appellant contends that without a toxicologist and neurologist he was prevented from presenting evi-

dence concerning his inability to form a specific intent due to his drug use.[8]

The decision to appoint an expert witness is within the sound discretion of the trial court and will not be disturbed except for a clear abuse of that discretion. *United States ex rel Dessus v. Pennsylvania,* 316 F.Supp. 411 (E.D.Pa.1970), *aff'd,* 452 F.2d 557 (3rd Cir.1971), *cert. denied,* 409 U.S. 853, 93 S.Ct. 184, 34 L.Ed.2d 96 (1972); *Commonwealth v. Gelormo,* 327 Pa.Super. 219, 475 A.2d 765 (1984). There is no obligation on the part of the Commonwealth to pay for the services of an expert. *Commonwealth v. Williams,* 522 Pa. 287, 294, 561 A.2d 714, 718 (1989) (citing *Commonwealth v. Box,* 481 Pa. 62, 391 A.2d 1316 (1978)); *Commonwealth v. Rochester,* 305 Pa.Super 364, 451 A.2d 690 (1982). However, in a capital case, an accused is entitled to the assistance of experts necessary to prepare a defense. *United States ex rel. Dessus,* 316 F.Supp. at 418.

We are convinced that the appellant was given sufficient expert assistance to prepare his defense. A review of the record indicates that the appellant's request for a ballistics expert and a psychiatrist were granted by the trial court. We find that the testimony of the psychiatrist would have been helpful in proving that the appellant did not have the requisite specific intent for the crime. However, our review of the defendant's case-in-chief finds that the defendant's counsel failed to use the expert testimony of the psychiatrist. Of course, that is the appellant's privilege in formulating a trial strategy, but the appellant cannot now assert that he was prevented from presenting his case where he failed to utilize the experts approved by the court. We cannot find that the trial court abused its discretion in denying a toxicologist and neurologist to the appellant.

---

**8.** Appellant does not explain how he was prejudiced by the failure of the court to appoint a statistician, jury selection expert or sociologist/criminologist. Therefore, we will not address the court's alleged error in this regard.

258

■ The appellant also alleges that the trial court erred in denying appellant's request for a handwriting analyst to examine a letter written to him by Bortz while both men awaited their respective trials. The letter contained a last line indicating that the appellant had not been present the night of the murders and stating that Bortz was sorry for saying that the appellant was present.

Appellant's argument is that a handwriting expert could have testified that the last sentence was in Bortz' handwriting, and, therefore, destroyed his credibility as a witness. We find that the jury had the opportunity to assess Bortz' credibility as a witness on the stand. Bortz testified on the issue of whether or not he wrote the last sentence of the letter. We cannot find that the trial court abused its discretion in refusing to approve a handwriting analyst.

Appellant asserts that the trial court also erred in failing to appoint assistant counsel for his representation, basing his contention on the theory that in capital cases all defendants are entitled to an assistant as well as a lead counsel. He neglects to support this assertion with case authority, or even to explain how he was prejudiced by the trial court's refusal to appoint assistant counsel. Accordingly, this claim is meritless.

■ Next, appellant claims error in the court's denial of his motion for discovery of the prosecution's sentencing evidence. Specifically, he argues that his sentence should be reversed because of the Commonwealth's failure to provide him with formal notice that the death penalty would be sought, or with notice of the aggravating circumstances which were the basis for the death penalty. Appellant concedes that Pa.R.Crim.P. 352, which requires disclosure of any "aggravating circumstances which the Commonwealth intends to submit at the sentencing hearing," was not in effect at the time of his trial.[9] Nonetheless, appellant contends that such disclosure was required by due process.

9. Present Rule 352 adopted February 1, 1989, became effective as to cases in which the arraignment is held after July 1, 1989.

The only aggravating circumstance presented by the Commonwealth at the guilt phase was appellant's prior conviction for third degree murder. Appellant does not address how he was prejudiced by the failure to disclose information which he, better than anyone else, was aware of.

Appellant next maintains that the charges against him should be dismissed due to various acts of bad faith by the Commonwealth. The first of these alleged misdeeds is that the Commonwealth elicited testimony about appellant's blood type after stipulating that such evidence would not be used at trial. The record reflects that the prosecution asked defense witness Stirton, "What type of blood does Carter have?" (N.T. 6/11/88 V.II. at 502). This question was objected to by defense counsel, and the question was withdrawn. Comments by the Commonwealth's attorney do not constitute reversible evidence unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant. *Commonwealth v. Garcia*, 505 Pa. 304, 316, 479 A.2d 473, 479 (1984) (quoting *Commonwealth v. Van Cliff*, 483 Pa. 576, 582, 397 A.2d 1173, 1176 (1979)). The trial court determined that no improper inference could be drawn from the question, and we find no reason to disturb the trial court's decision.

The second of appellant's grievances concerns an allegation that his blood was illegally seized after the Commonwealth obtained an ex parte warrant. Appellant fails to specify in what way his rights were violated, or how he was prejudiced by the seizure of the blood under warrant. This claim is meritless.

Third, appellant contends that the Commonwealth made reference to the boots he was wearing the day of the murder, despite the suppression of this evidence by the trial court. Appellant does not explain how the reference to his boots prejudiced his case. In fact, appellant's own counsel discussed evidence pertaining to his boots during his closing argument.

Boots. Boots. Now, what did Adria say about boots? Do we remember that? Adria was testifying. And she said during this day from March 7th into March 8th, they were at the apartment ... And [Adria] remembered what Darryl was wearing. He was wearing boots because he stepped on her foot or something. She remembered he was wearing his boots. How did he have his boots on during the day if he switched into them after he killed Rod Miller? Minor inconsistency? They didn't get their stories straight.

(N.T. 7/18/88 V.I. at 254–255).

We, thus, find this claim meritless.

■ Fourth, appellant would have us find prosecutorial misconduct in the Commonwealth's failure to provide him with a transcript of Jonathan Bortz' pre-trial hearing. Under Rule 5000.5 of the Pennsylvania Rules of Judicial Administration, a request for a transcript may be made to the reporter, the clerk of the trial court, or the district court administrator. The Commonwealth has no responsibility for issuing transcripts. Appellant neglects to explain how he was prevented from obtaining this information since he was equally capable of requesting a transcription of the proceedings through any of the agents authorized under Rule 5000.5.

Fifth, appellant alleges the prosecutor acted in bad faith by failing to comply promptly with discovery requests. Appellant does not indicate what discovery material was not disclosed, or how the delay in producing discovery was prejudicial.

■ Appellant's final allegation of bad faith is that the court's sequestration order was not followed. Specifically, he asserts that the jurors were released four times from their sequestration for breakfast. Since no explanation is provided as to how this was a bad faith action by the prosecution, and no allegation is made that the jury was subjected to any improper influences, this claim fails.

■ Next, appellant argues that his counsel was advised prior to the preliminary hearing that Juaniata Anderson could not identify either of her assailants. Appellant claims that

based on this alleged representation, he decided not to ask for a pre-trial line-up where he could test Anderson's ability to make an accurate identification. First, no citation to the record is offered in support of his allegation that such a misrepresentation was in fact made, nor does appellant contend that the alleged statement was an intentional attempt to deceive him. Second, we have held that the Commonwealth is free to re-evaluate its evidence. *See Commonwealth v. Ware,* 459 Pa. 334, 329 A.2d 258 (1974). In *Ware,* the defendant argued that he relied on the prosecution's representation that fingerprint evidence would not be presented at trial. We found no evidence that the prosecution attempted to deceive the defendant and held the representation was merely an individual prosecutor's estimate of the probative significance of the print.

In the present situation, we find no attempt to deceive the appellant. The record reflects that Ms. Anderson was unable to identify her assailant during the period in which she was in the hospital. Assuming *arguendo* the prosecutor made the statement the appellant attributes to him, the statement was no more than the individual prosecutor's estimate of the witness's ability to identify the appellant and did not prevent the Commonwealth from re-evaluating its evidence when Ms. Anderson's identification became positive.

In a related issue, appellant asserts that the trial court erred in denying his pre-trial request for a voice line-up. He argues that because the District Attorney's office told him that the sole basis of Juaniata Anderson's identification was her recollection of her attacker's voice, he was entitled to the requested procedure.

The decision to grant a request for a lineup is within the sound discretion of the trial court, and such a decision will not be disturbed absent an abuse of discretion. *Commonwealth v. Rush,* 522 Pa. 379, 562 A.2d 285 (1989). Ms. Anderson's identification was based primarily on her independent observations, not on the recognition of the defen-

dant's voice. We, therefore, cannot find that the trial court abused its discretion in refusing to grant a voice lineup.

Next, appellant asserts that the trial court erred in postponing decision on many of the his pretrial motions until after jury selection. Appellant omits any explanation as to how the delay prejudiced his ability to prepare for trial.

Appellant also contends that the court erred in permitting the prosecutor to ask leading questions throughout the trial. However, his brief includes not a single transcript citation demonstrating this improper questioning, nor does he aver that any improper information was elicited through the questioning he finds objectionable. Accordingly, this claim too must fail.

Appellant assigns error to the trial court's denial of his pretrial petition for writ of habeas corpus. This claim presents yet another attempt to obtain an inappropriate remedy for his illegal arrest. *See Commonwealth v. Gallagher*, 353 Pa.Super. 426, 447, 510 A.2d 735, 746 (1986), *rev'd on other grounds*, 519 Pa. 291, 547 A.2d 355 (1988) ("an illegal arrest, after conviction, will not furnish grounds for discharge on a writ of habeas corpus").

Appellant asserts that the district attorney committed prosecutorial misconduct during his closing argument by referring to appellant as "Mr. Drugs." It is well settled that a prosecutor's remarks fall within the ambit of fair comment if they are supported by evidence and contain inferences which are reasonably derived from that evidence. *Commonwealth v. Hardcastle*, 519 Pa. 236, 254, 546 A.2d .1101, 1109 (1988).

A new trial is not mandated every time a prosecutor makes an intemperate or improper remark. To constitute reversible error, the language must be such that its unavoidable effect would be to prejudice the jury, forming in their minds a fixed bias and hostility towards the defendant, so that they could not weigh the evidence and render a true verdict. *Id.*

In *Commonwealth v. Rivera*, 470 Pa. 131, 367 A.2d 719 (1976), the prosecutor called the defendant "junkie" in a

prosecution for murder, rape and conspiracy. We held this statement was not prejudicial to the defendant because the defendant's drug use had been previously brought to the jury's attention.

Here, appellant's own testimony is replete with references to his drug activity. Further, trial counsel, during his closing argument, suggested that appellant was guilty, at the most, of third degree murder because of his intoxication from the use of several illegal drugs. Thus, given the evidence presented in this case, the prosecution's statement did not have the unavoidable effect of prejudicing the jury.

▮ Appellant also complains that during closing argument, the district attorney implied that appellant had been lying when he testified that he was offered a plea bargain. This issue arose from the following factual situation. During defense counsel's direct examination, appellant asserted his innocence. To support his declaration, appellant indicated that he had rejected the Commonwealth's offer for him to avoid the death penalty by pleading guilty. During the Commonwealth's closing argument the district attorney stated the following:

> But let's keep his interest in mind because that is tremendously important ... Now you heard what he had to say, and he left a nine hour gap. Now do you believe him? And then he told you we offered him life. Now, you know, what evidence do you have of that? You have his word (indicating). He told you he got an offer of life. That's from the man who forgot about nine hours the night two people were murdered.

(N.T. 7/18–7/22/88 V.I. at 309).

Appellant asserts that the district attorney was, in essence, improperly testifying that no plea had ever been offered, when in fact it had. We agree with the appellant that the jury could have inferred that the district attorney had personal knowledge that no plea bargain was offered, and that the appellant had lied about the plea bargain.

We must determine whether the district attorney's statement, and the inferences that could be drawn from it, were so prejudicial as to require a new trial.

As an initial matter, it is unclear from the record whether or not the appellant was offered a plea bargain. The appellant testified that he was offered a sentence of life imprisonment, but turned it down because he was innocent. Later, at sidebar, the district attorney did not state whether any such plea bargain was offered or whether he had any knowledge of a plea bargain. (N.T. 7/18–7/22/88 V.I. at 309).

Comments by the Commonwealth's attorney do not constitute reversible error unless the unavoidable effect of such comment would be to prejudice the jury. *Commonwealth v. Garcia,* 505 Pa. 304, 479 A.2d 473 (1984). Whether a reversal of judgment is required depends on whether the remarks made by the prosecutor are of such a nature that they would seriously threaten the jury's objectivity and deprive the accused of a fair trial. *Commonwealth v. Brown,* 489 Pa. 285, 414 A.2d 70 (1980).

In the instant case, we do not believe that the remarks made by the district attorney were sufficiently prejudicial to warrant reversal and a new trial. The appellant testified that he had received a plea bargain of life imprisonment. The district attorney did not call the appellant a liar or directly attack his credibility. Instead, the district attorney asked the jury to weigh the evidence presented at trial and determine whether the appellant was telling the truth. Thus, we do not believe that the prosecutor's argument "improperly intrud[ed] on the jury's exclusive function" because he merely asked the jury to weigh the testimony presented at trial. *See Commonwealth v. Potter,* 445 Pa. 284, 287, 285 A.2d 492, 493 (1971). Also, there is nothing in the record to support the appellant's claim that such a plea was made, or that the prosecutor knew about it and purposely implied to the jury that the appellant was lying. The record does not provide support to charge the prosecutor with such misconduct.

■ Assuming *arguendo* the district attorney's remarks were sufficiently prejudicial, we would still not reverse and remand for a new trial. Where evidence of guilt is overwhelming, a prejudicial remark by the prosecutor will not be grounds for reversal. *Commonwealth v. Stanton,* 316 Pa.Super. 397, 463 A.2d 19 (1983); *Commonwealth v. Baynes,* 269 Pa.Super. 563, 410 A.2d 845 (1979). In the present case, the remarks in question amounted to a small part of the district attorney's closing remarks. In light of the overwhelming case of guilt presented against the appellant, we would not reverse and remand the case for a new trial because of those remarks.

■ Additionally, prejudice by prosecutorial remarks can be cured by instructions from the trial court. *See Commonwealth v. Gilliard,* 300 Pa.Super. 469, 446 A.2d 951 (1982). In the present case, the trial court judge gave the jury instructions that carefully addressed this situation:

"Regardless of how or why, though you may have concluded that we are of a certain opinion, you are not bound nor should you even consider any opinion that you think the attorneys or myself have indicating the guilt or innocence of this defendant, the credibility of a witness, or any other matter. Because, I repeat, you decide the facts. And you get these from witnesses, not from the judge or from the attorney for the parties."

(N.T. 7/18–7/22 V.II. at 353–54.)

■ The jury was carefully cautioned not to give credence to any inferences drawn by the prosecutor in his closing remarks. Thus, assuming *arguendo* the prosecutor's remarks were sufficiently prejudicial, the prejudice was cured by the trial court's instructions.

Thus, this case is distinguished from our other cases where the prosecutor's statements were found sufficiently prejudicial to merit reversal. The prosecutor did not call the defendant a "liar" or otherwise directly attack his credibility. *See Commonwealth v. Potter,* 445 Pa. 284, 285 A.2d 492 (1971) (reversal where prosecutor calls defendant "malicious liar"). The prosecutor did not comment on the ultimate guilt or innocence of

the defendant. *See Commonwealth v. Russell,* 456 Pa. 559, 322 A.2d 127 (1974) (prosecutor had "no doubt" of the defendant's guilt after reviewing the evidence). The district attorney here did not make a misstatement of the evidence in the case thereby misleading the jury and usurping its function. In *Commonwealth v. Toth,* 455 Pa. 154, 314 A.2d 275 (1974), the prosecutor misrepresented the hearsay rules and the nature of hearsay testimony to the jury in his closing argument. We found that this misrepresentation warranted a new trial. In the present situation, the district attorney was urging the jury to evaluate the evidence not usurping its ultimate function. Nothing in the record demonstrates that the district attorney was misrepresenting facts in evidence or inferences that could be drawn from them.

Next, appellant asserts that the Commonwealth tampered with Bortz' written statement to police as evidenced by the fact that three copies of the same statement contained unexplained variations. Appellant claims that because of this irregularity, Bortz' statement should not be considered, and as Bortz implicated him, all charges should be dismissed.

Although appellant was certainly entitled to argue to the jury that Bortz should not be believed because several of his statements were inconsistent, he fails to address why the alleged discrepancies would require suppression of all the statements. Accordingly, we find this issue to be meritless.

Appellant lists ten additional unbriefed issues. We have reviewed these claims, and have determined that they are all without merit.

Finally, in compliance with our statutory duty pursuant to 42 Pa.C.S.A. § 9711(h)(3) we must affirm the sentence of death unless we determine that the sentence was the product of passion, prejudice or any other arbitrary factor; the evidence fails to support the finding of at least one aggravating factor; or the sentence is excessive or disproportionate to the penalty imposed in similar cases. The record provides no basis on which we might conclude that the sentence of death were the product of passion, prejudice or any other arbitrary

factor. The evidence supports the finding of at least one aggravating circumstance specified in 42 Pa.C.S.A. § 9711(d). Further, we have reviewed the sentence imposed upon appellant and perceive no excess or disproportionality in comparison to the sentences imposed in similar cases. We find that the sentence of death in this instance complies with the concerns in the statute. Accordingly, the judgment of sentence must be affirmed.[10]

LARSEN, J., did not participate in the consideration or decision of this case.

MONTEMURO, J., who was an appointed Justice of the Court at the time of argument, participated in the decision of this case in his capacity as a Senior Justice.

---

10. The Prothonotary is directed to transmit a full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court to the Governor. 42 Pa.C.S.A. § 9711(i).