**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Calvin BUTLER, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 21, 1998.
Filed March 17, 1999

Robert F. Pappano, Asst. Public Defender, Media, for appellant.

Louis G. Stesis, Asst. Dist atty., Media, for the Com., appellee.

Before POPOVICH, HUDOCK, JJ. and CERCONE, President Judge Emeritus.

POPOVICH, J.:

¶ 1 Appellant Calvin Butler appeals from the judgment of sentence entered on March 19, 1998, in the Court of Common Pleas of Delaware County, following his conviction of voluntary manslaughter.[1] We affirm.

¶ 2 The record reveals the following: On February 25, 1997, Stephanie Clark was shot while inside a residence she shared with appellant and her two sons. The bullet entered her left cheek and exited the right side of her neck. Two days later, she died as a result of the gunshot wound. On March 4, 1997, a criminal complaint was filed and charged appellant with murder and related offenses, possession of an instrument of crime and possession of a prohibited offensive weapon. Appellant filed an omnibus pretrial motion to suppress. A hearing was held on January 23, 1998, and the motion to suppress was denied. Appellant also filed a motion in limine that the trial court denied in part and granted in part. A jury convicted appellant of voluntary manslaughter on January 29, 1998, and he was subsequently sentenced to 6½ to 15 years imprisonment and ordered to pay costs and restitution in the sum of $8,391.00. This appeal followed.

¶ 3 Appellant raises the following issues for our consideration:

(1) Whether the suppression court erred by denying appellant's motion to suppress the fruits of an illegal arrest?

(2) Whether the trial court should have granted appellant's motion in limine to preclude the testimony of Pamela White, Rodney Clark and Jared

---

1. 18 Pa.C.S.A. § 2503.

Monk, all of whom testified regarding appellant's prior bad conduct/acts with the victim?

(3) Whether the verdict was against the weight of the evidence?

Brief of Appellant at 8.

 ¶ 4 First, we consider whether the lower court erred when it denied appellant's motion to suppress the fruits of his detention on the day of the shooting. When reviewing an order denying a motion to suppress, we must determine whether the record supports the lower court's findings of fact. *Commonwealth v. Frank*, 407 Pa.Super. 500, 595 A.2d 1258, 1259 (1991). If it does, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are erroneous. *Id.* Our review is limited to considering the evidence of the prosecution's witnesses and so much of the evidence of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Id.*

¶ 5 The suppression hearing transcript discloses the following about the events surrounding appellant's initial detention: Several police vehicles were dispatched to appellant's residence at approximately noon on February 25, 1997. Police dispatch had notified the responding officers that a woman had been shot in the head inside the residence. While traveling to the residence, the officers received a second message from police dispatch that the actor might still be on the scene. The first police vehicles arrived approximately two to three minutes after the initial radio alert.

¶ 6 As the officers approached the residence, they noticed movement in the venetian blinds of one of the windows. As they continued towards the front door they saw appellant through the glass portion of the storm door. The officers ordered appellant to put his hands up and come out through the door. Appellant complied and was frisked, handcuffed and placed in the rear seat of an unmarked police vehicle

driven by Chief Donald Molineux of the Yeadon Borough Police Department. Both of the vehicle's rear doors were closed but operable from the inside.[2] Chief Molineux sat in the driver's seat with the front, driver's-side door open and asked appellant who he was, whether he lived at the residence and whether anyone else lived there. Appellant told Chief Molineux his name and that he lived at the residence with Stephanie Clark.

¶ 7 At that point, Detective William Costello, also of the Yeadon Police Department, came from the house and told Chief Molineux that a woman had indeed been shot. Chief Molineux then gave appellant *Miranda* warnings.[3] Appellant told Chief Molineux that he was willing to waive his rights and answer the Chief's questions. Subsequently, appellant advised the Chief that he had lived at the residence for 12 years, and that Stephanie Clark and her two sons also lived at the residence. In response to the Chief's request to explain what happened, appellant said that he was in bed when Ms. Clark came home. Appellant was surprised by Ms. Clark's arrival because he believed she was supposed to be at work. An argument ensued, and Ms. Clark retrieved a gun from the bedroom area. The couple struggled over the gun in the hallway outside the bedroom and it discharged, striking Ms. Clark. After appellant finished his explanation, Chief Molineux informed him that he would be taken to police headquarters for further questioning.

¶ 8 At police headquarters, Chief Molineux noticed a spot of blood on the right side of appellant's head, near his ear. The Chief then advised appellant he wanted to ask him additional questions concerning the incident, and, using a form regularly used by the police department, again gave appellant *Miranda* warnings. Appellant signed and dated the form. Appellant also signed and dated a "consent to search" form, authorizing the police to search his

---

2. The testimony at the hearing does not reveal whether the vehicle's rear doors were locked.

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

residence. Chief Molineux then told appellant that he wanted to take a formal statement from him using a tape recorder. However, appellant refused. Detective James DiRomualdo of the Criminal Investigation Division of the Office of the District Attorney also sought appellant's consent to perform a search of his person. Appellant declined to give his consent, and a search warrant was subsequently obtained which authorized the search of appellant's person and the seizure of his clothing.[4] Prior to appellant's refusals to give consent, appellant had been cooperative with the police.

¶ 9 Appellant argues that his detention constituted a warrantless arrest that was not supported by probable cause, and, therefore, the lower court should have suppressed the statements he made to the police following his initial detention and the physical evidence secured as a result of the searches of his residence, person and clothing. The lower court provided the following reasons for denying appellant's motion to suppress: 1) "the police had a right to detain [appellant] for investigation purposes," 2) appellant was given *Miranda* warnings prior to making his inculpatory statements, 3) the search of his residence was consensual, and 4) the search of his person and seizure of his clothing were based upon an affidavit of probable cause. N.T. Trial, 1/26/98, at 6–7.

¶ 10 At the outset, we must determine whether appellant's detention was custodial or investigative. Our Supreme Court has explained that Fourth Amendment jurisprudence has developed three categories of interaction between citizens and the police. *Commonwealth v. Ellis*, 541 Pa. 285, 293, 662 A.2d 1043, 1047 (1995).

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to

stop or to respond. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Finally, an arrest or "custodial detention" must be supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Commonwealth v. Rodriquez*, 532 Pa. 62, 614 A.2d 1378 (1992).

*Id.* at 293–94, 662 A.2d at 1047–48 (footnote omitted). An arrest is defined as [a]ny act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest.... The test is an objective one, i.e., viewed in the light of the reasonable impression conveyed to the person subjected to the seizure rather than the strictly subjective view of the officers or the persons being seized.

*Commonwealth v. Rodriquez*, 532 Pa. 62, 74, 614 A.2d 1378, 1384 (1992) (quoting *Commonwealth v. Duncan*, 514 Pa. 395, 400, 525 A.2d 1177, 1179 (1987)).

¶ 11 When the police saw appellant through the storm door, they ordered him to come out of the house with his hands up. Appellant was then frisked, handcuffed with his hands behind his back and placed in the rear seat of Chief Molineux's vehicle.[5] We find that the most reasonable impression conveyed to appellant was that he was under the control and within the custody of the police. *See*

4. Blood samples were collected from his clothing and body, and his hands were tested for gunshot residue.

5. At appellant's trial, Chief Molineux testified that appellant did not ask why he was handcuffed, and no reason was given to him. N.T. Trial, 1/27/98, at 196.

*Frank, supra* (an arrest had occurred where police initially handcuffed a defendant when they apprehended him); *Commonwealth v. Martinez,* 437 Pa.Super. 93, 649 A.2d 143 (1994) (where police handcuffed an individual to protect themselves while they searched the individual's residence, but failed to inform individual of reason for using handcuffs, detention was custodial).[6] Therefore, his detention was custodial.

■ ¶ 12 We next consider whether appellant's detention was supported by probable cause. The first officers at appellant's residence had been informed by police dispatch that a woman had been shot and that the actor might still be on the scene. The officers saw venetian blinds move inside the house, and shortly thereafter saw appellant through the storm door. While such events give rise to reasonable suspicion, they fail to establish probable cause. However, we believe probable cause to arrest appellant crystallized once the police confirmed that a woman had recently been shot and determined that appellant was the only other person inside the house. *See Commonwealth v. Fromal,* 392 Pa.Super. 100, 572 A.2d 711, 717 (1990) (probable cause exists where the reasonably reliable information within the knowledge of the officer would warrant a man of reasonable caution to believe that the suspect had committed a crime). Hence, we find that appellant's detention was unconstitutional at the outset, but shortly thereafter was supported by probable cause.

■ ¶ 13 Next, we must consider whether the lower court should have suppressed any of the evidence acquired as a result of appellant's detention. The test for determining excludability is not whether the evidence would have come to light but for the illegal actions of the police, but rather, whether the evidence "has been

come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "The relevant inquiry in determining whether the taint of an illegal arrest is purged by a subsequent legal arrest is whether the evidence obtained following the legal arrest was discovered through any exploitation of the initial illegal arrest." *United States v. Edwards,* 103 F.3d 90, 95 (10th Cir.1996) (citing *United States v. Walker,* 535 F.2d 896 (5th Cir.1976), *cert. denied* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976)).

¶ 14 We find the facts in *Walker, supra,* analogous to those in the present case. There, a defendant was suspected of attempting to withdraw funds from a bank account on a forged withdrawal slip. He was detained by an off-duty police officer working at the bank as a security guard. The off-duty officer placed the defendant in an office and instructed him to wait until an on-duty officer arrived. When an on-duty officer arrived, the officer personally compared the signature on the forged withdrawal slip with the signature authorized for that account and noticed a discrepancy. The officer also interviewed the bank personnel who witnessed the event. The officer then advised the defendant of his rights, placed him under arrest and instructed him to empty his pockets. Among the items in the defendant's pockets was a letter that became the basis of a federal charge of possession of stolen mail. The district court found that the defendant's detention by the off-duty officer was an illegal arrest and suppressed the letter as tainted fruit thereof. In reversing the district court, the court of appeals found,

> even assuming arguendo that [the off-duty officer's] arrest of [the defendant] was illegal, it is obvious that the evidence seized by [the on-duty officer] was

---

6. We are mindful that our Supreme Court has specifically refrained from holding that an arrest occurs whenever police officers restrain an individual using handcuffs. *See Commonwealth v. Carter,* 537 Pa. 233, 247 n. 2, 643 A.2d 61, 67 n. 2 (1994) ("[w]e, of course do not hold that every time the police place an individual in handcuffs that individual has been arrested"). However, the totality of the circumstances in this case, which includes appellant's placement in the rear seat of a police vehicle, supports our conclusion.

not discovered through any exploitation of that initial arrest. To hold otherwise on these facts would be tantamount to adopting the "but for" test that the Supreme Court eschewed in *Wong Sun. Walker, supra,* at 899. We find the same to be true under the facts in the present case.

¶15 Here, all the police learned during the brief period of appellant's illegal arrest was his name and that he and Stephanie Clark both resided in the house.[7] This information was not inculpatory. Further, the inculpatory evidence seized after the police possessed probable cause to arrest appellant was not obtained by exploiting the information learned during appellant's illegal arrest. Clearly, the police did not search appellant's residence in response to his initial statements. Officers were already in the process of searching the house when appellant began responding to Chief Molineux's preliminary questions. Since the evidence at issue was not discovered as a result of the exploitation of his illegal arrest, the lower court did not err when it denied appellant's motion to suppress.

¶16 In appellant's second issue, he argues that the lower court erred when it denied his motion in limine in part, permitting Pamela White and the victim's two sons, Rodney Clark and Jared Monk, to testify regarding prior bad acts or conduct of appellant. The admissibility of evidence is addressed to the sound discretion of the trial court and an appellate court may only reverse rulings on admissibility where the lower court abuses its discretion. *Commonwealth v. Walker,* 540 Pa. 80, 97, 656 A.2d 90, 99 (1995).

¶17 At trial, Pamela White, a friend of the victim, testified that on February 20,

1997, five days prior to the shooting, the victim told her "she wanted [appellant] to move out of her house because they weren't getting along." N.T. Trial, 1/27/98, at 39. Rodney Clark, twenty-three years old at the time of trial, testified that around Christmas of 1996, he noticed that his mother had a black eye. When Clark asked appellant about the injury, appellant stated, "I pushed her, you know, but it – I kind of like mugged her on the face." N.T. Trial, 1/27/98, at 46. Clark also testified that in the two or three months preceding the shooting, he had seen appellant "hit on [the victim] and ... pull her around by her hair...." N.T. Trial, 1/27/98, at 47. Additionally, Clark testified regarding an episode that occurred on February 23, 1997, two days before the shooting. According to Clark, appellant aggressively accused Clark, Jared Monk and the victim of stealing money from him. After it was discovered that the money had been misplaced among some laundry, the victim told appellant that she was tired of his accusations and that he was going to have to leave. Jared Monk, sixteen years old at the time of trial, also testified that the victim had a black eye around Christmas of 1996.

¶18 Since Ms. White's testimony that the victim told her that "she wanted [appellant] to move out of her house because they weren't getting along" does not involve bad acts or conduct of appellant, his argument is inapplicable to her testimony. With respect to the testimony of Clark and Monk, we do not believe that the trial court abused its discretion in admitting their testimony to prove appellant's intent to harm the victim, particularly where the abuse of which they testified occurred within two to three months of the shooting.[8] *See id.* at 97–98, 656 A.2d at 99

---

7. It is apparent from the record that appellant's arrest only lacked probable cause long enough for the police to find Ms. Clark, determine that no one else was in the house and report such to Chief Molinuex.

8. The Trial Court's opinion explained its reason for denying appellant's motion in limine, as follows:

 Certain other issues concerning the admission of evidence which focused on the nature of [appellant's] and the victim's tempestuous relationship were the subject of the court's consideration during the pen-

(evidence of repeated abuse may be admitted to prove intent to kill). For the above reasons, we find appellant's second issue meritless.

¶ 19 Lastly, appellant asserts that his conviction was against the weight of the evidence. Since appellant first raised this issue in the present appeal, it has been waived under Pa.R.Crim.P. 1124A(1). Rule 1124A became effective on January 1, 1998, and provides, in pertinent part:

> **Rule 1124A. Challenges to the Weight of the Evidence**
>
> (1) A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:
>
> (a) orally, on the record, at any time before sentencing;
>
> (b) by written motion at any time before sentencing; or
>
> (c) in a post-sentence motion.

*Id.* The comment to Rule 1124A explains, The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived. Appellate review of a weight of the evidence claim is limited to a review of the judge's exercise of discretion.

*Id.* Since appellant's trial, conviction and sentencing all occurred after Rule 1124A became effective, we cannot except him from its requirements.[9] Accordingly, the issue has been waived for failing to present it first to the lower court. *Cf. Commonwealth v. Monroe*, 373 Pa.Super. 618, 542 A.2d 113 (1988) (under prior rule requiring post verdict motions, argument that verdict was against the weight of the evidence was waived since it was not raised in post-verdict motions).

¶ 20 In sum, we conclude that the lower court did not err by refusing to suppress the evidence obtained following appellant's arrest, or by admitting the testimony of Pamela Wright, Rodney Clark and Jared Monk. Further, appellant's weight of the evidence argument is waived. Therefore, we affirm the judgment of the lower court.

¶ 21 Judgment of sentence affirmed.

---

dency of this case. However, all such issues *related to the question of [appellant's] intent to harm the victim.*
Trial Court Opinion, 5/1/98, at 2 n. 1.

**9.** Appellant's trial took place on January 26–29, 1998. He was convicted on January 29, 1998, and sentenced on March 19, 1998.