COMMONWEALTH of Pennsylvania,
Appellee,

v.

John A. GRUFF, Appellant.

Superior Court of Pennsylvania.

Submitted Feb. 4, 2002.
Filed March 27, 2003.
Reargument Denied May 29, 2003.

Elizabeth A. Hoffman, Harrisburg, for appellant.

Daniel W. Stern, Asst. Dist. Atty., New Bloomfield, for Com., appellee.

BEFORE: LALLY–GREEN, BENDER and KELLY, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 Appellant, John A. Gruff, appeals from the judgment of sentence entered on November 9, 2000. We affirm.

¶ 2 Our review of the record reflects the following. Timothy McCrone, Appellant's neighbor, testified that Appellant accosted him on March 8, 2000. N.T., 10/23/00, at 27, 30–32. McCrone testified that, as he was walking home from a neighbor's house, Appellant grabbed him from behind, and brought a loaded rifle equipped with a bayonet up toward him until the blade was touching McCrone's neck. *Id.* at 30–32. McCrone testified that Appellant stated, "You're one of them, ain't you?" *Id.* at 32. Appellant then repeated the phrase one or two more times and then added, "I just ought to kill you.... Do you want to die today or tomorrow?" *Id.* McCrone responded that he did not want to die at all. *Id.* After a few moments, when he no longer felt the bayonet touching his neck, McCrone escaped and ran into the woods. *Id.* at 33. Appellant made no attempt to hold onto McCrone or fire a shot at him while McCrone ran off. *Id.* McCrone ran to a neighbor's house and called his wife to get him. *Id.*

McCrone reported the incident to the Pennsylvania State Police. *Id.* at 34.

¶ 3 On October 23, 2000, a jury convicted Appellant of aggravated assault (two counts), simple assault, driving under the influence of alcohol to a degree which rendered Appellant incapable of safe driving, terroristic threats, recklessly endangering another person, and possession of an instrument of crime.[1]

¶ 4 Appellant was sentenced on November 9, 2000, to 5 to 10 years on one count of aggravated assault with a merger of the sentences for the other count of aggravated assault, simple assault, terroristic threats, and recklessly endangering another person. Appellant was sentenced to 2½ to 5 years on the possession of firearm by convicted felon, and a five-year period of probation for possessing an instrument of crime. Appellant received a sentence of 30 days to 2 years for the driving under the influence conviction.

¶ 5 Appellant filed a timely motion to reconsider sentence, which was denied. No appeal followed. On May 8, 2001, Appellant filed a PCRA petition alleging that counsel had neglected to file a notice of appeal. On May 11, 2001, by order of court, Appellant's right to a direct appeal was restored. This appeal followed.

¶ 6 Appellant raises three issues on appeal:

1. Did the Commonwealth prove beyond a reasonable doubt that Appellant committed attempted aggravated assault when the evidence did not show that he made a threat of immediate harm and took a substantial step toward injuring the victim while holding him for a mat-

ter of seconds or when the victim ran away?

2. Did the Commonwealth present sufficient evidence to prove beyond a reasonable doubt that Appellant was driving under the influence to a degree which rendered him incapable of unsafe driving when there was no evidence of erratic driving or of conduct indicating intoxication?

3. Did the trial court abuse its discretion when it did not sustain defense counsel's objection to the prosecutor's highly inflammatory comment to the jury during closing arguments by giving a curative instruction or declaring a mistrial?

Appellant's Brief at 3.

¶ 7 Appellant first asserts that the evidence was insufficient to support his convictions for aggravated assault under 18 Pa.C.S.A. § 2702(a)(1) and (4).[2] Appellant complains that the Commonwealth did not prove that he made a threat of immediate harm and took a substantial step toward injuring the victim.

¶ 8 Our standard of review for a challenge to the sufficiency of the evidence is well settled. We must view all the evidence in the light most favorable to the verdict winner, giving that party the benefit of all reasonable inferences to be drawn therefrom. *Commonwealth v. Torres,* 564 Pa. 219, 766 A.2d 342, 344 (2001). Additionally, it is not the role of an appellate court to weigh the evidence or to substitute our judgment for that of the factfinder. *Commonwealth v. Vetrini,* 734 A.2d 404, 407 (Pa.Super.1999).

1. Appellant pled guilty to the offense of convicted felon in unlawful possession of firearm prior to trial.

2. We note that while Appellant alleges that he was convicted of attempted aggravated assault in his issue statement, he was convicted of aggravated assault.

¶ 9 Aggravated assault is defined in 18 Pa.C.S.A. § 2702. Sections 2702(a)(1) and (a)(4) provide as follows:

(a) **Offense defined.**—A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;...

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon; ...

18 Pa.C.S.A. §§ 2702(a)(1) and (a)(4). Also, the following terms are defined in 18 Pa.C.S.A. § 2301:

"**Bodily injury.**" Impairment of physical condition or substantial pain

"**Serious bodily injury.**" Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

"**Deadly weapon.**" Any firearm, ..., or any device designed as a weapon and capable of producing death or serious bodily injury...

For aggravated assault purposes, an "attempt" is found where the accused, with the required specific intent, acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another. *Commonwealth v. Galindes*, 786 A.2d 1004, 1009 (Pa.Super.2001), *appeal denied*, 569 Pa. 691, 803 A.2d 733 (2002). As our Court has previously stated:

As intent is a subjective frame of mind, it is of necessity difficult of direct proof[.][W]e must look to all the evidence to establish intent, including, but not limited to, appellant's conduct as it appeared to his eyes[.] Intent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from the attendant circumstances.

*Commonwealth v. Roche*, 783 A.2d 766, 768 (Pa.Super.2001), *appeal denied*, 568 Pa. 736, 798 A.2d 1289 (2002).

¶ 10 First, we address the standards applicable to the attempt segment of 18 Pa.C.S.A. § 2701(a)(1). Attempt in this context is demonstrated by proving that the accused acted in a manner which constitutes a substantial or significant step toward perpetrating serious bodily injury upon another along with the intent to inflict serious bodily injury. *Commonwealth v. Alexander*, 477 Pa. 190, 383 A.2d 887 (1978). The *Alexander* Court made clear that an attempt under § 2701(a)(1) requires a showing of some act, albeit not one causing serious bodily injury, accompanied by an intent to inflict serious bodily injury. *Id.* at 889.

¶ 11 In *Alexander*, the defendant was convicted of aggravated assault under § 2701(a)(1) in circumstances where he delivered one punch to the victim's head and then walked away. *Id.* at 888. The Supreme Court stated that where the injury actually inflicted did not constitute a serious bodily injury, the charge of aggravated assault can be supported only if the evidence supports a finding that the blow delivered was accompanied by the intent to inflict serious bodily injury. *Id.*

where the victim did not actually sustain the requisite serious bodily injury, we cannot say that the mere fact that a punch was delivered to that portion of the body is sufficient, without more, to support a finding that appellant intended to inflict serious bodily injury. Where the injury actually inflicted did not constitute serious bodily injury, the charge of aggravated assault can be supported only if the evidence supports a

finding that the blow delivered was accompanied by the intent to inflict serious bodily injury.

*Id.* at 889.

¶ 12 The Court concluded that such intent was not demonstrated in the record and listed factors to consider in determining whether the intent to inflict serious bodily injury was present. *Id.* Those factors included evidence of a significant difference in size or strength with the victim, the defendant's use of a weapon or implement to aid his attack, and his statements before, during or after the attack which might indicate his intent to inflict further injury on the victim. *Id.* at 889. The Court concluded by saying:

> To accept the Commonwealth's argument in this case would be to allow an admitted simple assault to be bootstrapped up to an aggravated assault. We hasten to add that a simple assault combined with other surrounding circumstances, may, in a proper case, be sufficient to support a finding that an assailant attempted to inflict serious bodily injury, thereby constituting aggravated assault. All we hold is that the evidence in the instant case is insufficient to support such a finding.

*Id.* at 889–890.

¶ 13 Our Court's rulings, consistent with *Alexander*, focus on whether the record reflects evidence of an intent to inflict serious bodily injury. Aggravated assault can be demonstrated with proof of such intent regardless of whether it was impossible to actually cause serious bodily injury. *Commonwealth v. Lopez*, 439 Pa.Super. 625, 654 A.2d 1150 (1995). Likewise, aggravated assault can be found with proof of such intent regardless of whether any serious bodily injury resulted. *Commonwealth v. Fierst*, 423 Pa.Super. 232, 620 A.2d 1196, 1202 (1993); *Commonwealth v. Rodriquez*, 449 Pa.Super. 319, 673 A.2d 962 (1996). Finally, aggravated assault can be found with proof of such intent even if no actual injury resulted. *Commonwealth v. Rosado*, 454 Pa.Super. 17, 684 A.2d 605, 607 (1996).

¶ 14 In *Lopez*, an accused fired eight bullets at the front door of an empty residence of his girlfriend. The Court held that a prima facie case of aggravated assault was established by the Commonwealth if the accused possessed the requisite intent to cause serious bodily injury (for § 2702(a)(1)) or to cause bodily injury to another via the use of a deadly weapon (for § 2702(a)(4)), even though it was impossible for the accused actually to cause either serious bodily injury or bodily injury because of the absence of a person inside the residence. 654 A.2d at 1152.

¶ 15 In *Fierst*, the defendant beat David Perl in order to get his gun. 620 A.2d at 1201. When Ms. Mainolfi jumped on defendant in response to Perl's screams, defendant began to beat her by hitting her on her head and arms with a black instrument she thought was a police blackjack. *Id.* at 1201–02. When defendant noticed that Perl was escaping, he stopped beating Ms. Mainolfi. *Id.* Our Court held that "it can be inferred that he [defendant] ... attempted to injure seriously Ms. Mainolfi even though Perl successfully thwarted the continued attack on her." *Id.* at 1202. Our Court upheld aggravated assault convictions *vis a vis* Perl and Mainolfi, even though Mainolfi was not seriously hurt. *Id.*

¶ 16 Also, defendant then drove in the opposing lane of traffic, apparently attempting to commit suicide, and caused a driver-victim to swerve to avoid the collision with the defendant. *Id.* at 1202. Our Court again upheld the aggravated assault conviction *vis a vis* the driver, even though he suffered no injury. *Id.* at 1203.

¶ 17 In *Rodriquez*, the defendant and two confederates kicked and punched an older man and looted his pockets as the man lay prostrate in a Philadelphia intersection. 673 A.2d at 966. Our Court upheld an aggravated assault conviction because the circumstances evidenced an intent to cause serious bodily injury. *Id.*

¶ 18 In *Rosado*, the accused fired bullets into the lighted second story windows of a building that housed the victims. The Court held that the fact the victims were not injured was irrelevant as it was clear that the accused attempted to cause serious bodily injury. 684 A.2d at 607.

¶ 19 Our Court has cautioned that the defendant's words and conduct are critical to a finding of the intent to cause serious bodily injury. *Commonwealth v. Roche*, 783 A.2d 766 (Pa.Super.2001), *appeal denied*, 568 Pa. 736, 798 A.2d 1289 (2002). There, the defendant called out to the victim, "are you a tough guy" and then delivered a single blow by a closed fist to the victim's eye, causing the victim to fall unconscious to the ground and to sustain a scalp laceration. *Id.* at 768–69. The victim suffered an orbital blowout, frontal rim and sinus fractures and had eight staples to close his head wound. *Id.* Our Court determined that the belligerent words and the throw of one punch were insufficient factors without more to support the conclusion that the defendant had the intent to cause serious bodily injury. *Id.* Said another way, whether the words and conduct do not evidence a specific intent to kill or to cause serious bodily injury, then the Appellant can not be found guilty of aggravated assault.

¶ 20 We now turn to § 2702(a)(4). Under this attempt section, the Commonwealth must demonstrate both a substantial step plus an intent to cause bodily injury to another with a weapon. The inquiry here is whether the surrounding circumstances evidenced defendant's intent to commit bodily injury with a weapon. *Lopez*; *Commonwealth v. Mayo*, 272 Pa.Super. 115, 414 A.2d 696, 702 and n. 9. (1979). In *Mayo*, the defendant placed a 6–inch long steak knife on the victim's throat and said, "Do you know what I do to people that accuse me of doing things that I don't do? . . . I kill them." *Id.* at 698. Then, the defendant scratched some letters on the victim's chest with the knife, drawing blood; however, the marks disappeared within hours. *Id.* He and his cohorts then successively raped the victim. *Id.*

¶ 21 Our Court concluded that the defendant's actions "point decisively to an intent not to inflict bodily injury, but to frighten and/or humiliate" the victim, a design which was in fact eminently successful. *Id.* at 703. The Court stated the "crucial fact to be his [defendant's] failure to pursue his obvious opportunity to inflict considerable pain or injury on" the victim. *Id.* The Court cautioned that "fear . . . is simply not sufficient to sustain a conviction for aggravated assault." *Id.*[3]

---

**3.** The *Mayo* Court did, however, refer the reader to a case where the opposite result was reached. 414 A.2d at 703 n. 10. *See, Commonwealth v. Kibe*, 258 Pa.Super. 353, 392 A.2d 831 (1978). There, the accused approached a lone woman at a late hour from the rear without warning and ordered her into her car. He put her in fear of an impending rape and, when she refused, he struck her with such force in the face to fracture her nose. His conviction for aggravated assault was affirmed. The *Kibe* Court concluded that the surrounding circumstances indicated that the defendant intended to inflict serious bodily injury, thus raising a simple assault to an aggravated assault.

*Kibe*, which was decided under § 2702(a)(1) and not under § 2702(a)(4), is not consistent with *Mayo*. The *Kibe* Court focused on whether, assuming the substantial step, the circumstances supported the conclu-

¶ 22 Our decisions subsequent to *Mayo* have consistently instructed that the defendant's words and conduct are to be examined to determine whether the requisite intent existed under § 2702(a)(4).[4] *See, e.g., Commonwealth v. Sanders,* 426 Pa.Super. 362, 627 A.2d 183 (1993), *appeal denied,* 535 Pa. 657, 634 A.2d 220 (1993). In *Sanders,* the defendant approached the victim in a bar and said that he did not like the victim and that "one day its going to be me and you one-on-one." *Id.* at 186. The victim told the defendant that he was ready to fight. *Id.* Then, defendant pulled out a gun, pointed it at the victim's chest, approached the victim and put the gun at the victim's head. *Id.* Fearing for his life, the victim grabbed at the defendant's wrist and the bar owner eventually took the gun from defendant. *Id.*

¶ 23 The *Sanders* Court emphasized that the fact finder can infer the requisite intent from the defendant's words and conduct. The Court cautioned that the mere act of pointing a gun at another person is not sufficient to establish a specific intent to cause bodily injury to the victim with a deadly weapon for purposes of § 2702(a)(4). *Id.* at 187. Nevertheless, the Court held that the jury could infer from defendant's conduct and his words that he had intended to shoot the victim and would have shot the victim but for the action of the victim in grabbing defendant's wrist and forcing the gun away from the victim's head. *Id.*[5]

¶ 24 We glean the following from these cases *vis a vis* the attempt aspect of §§ 2702(a)(1) and (a)(4). First, the resolution of each case is a function of the circumstances of the case as determined by the fact-finder. Second, a substantial step for purposes of aggravated assault-attempt under §§ 2702(a)(1) or (a)(4) can involve

---

sion that defendant intended to inflict serious bodily injury. *Mayo* is likely limited to the unique facts of its case, particularly since cases decided subsequent to *Mayo* focus more on the defendant's conduct and words than on the victim's reaction.

4. Our Court did address aggravated assault under § 2702(a)(4) in *Commonwealth v. Chance,* 312 Pa.Super. 435, 458 A.2d 1371 (1983). There, defendant, with a .22 caliber pistol, forced open the door of a car where a male and a female were embracing. *Id.* at 1372. He tied up the male victim and chased and eventually dragged the female victim back. *Id.* He placed a gun at her head and a struggle ensued. *Id.* The male victim, having freed himself, also struggled with the defendant. *Id.* The male victim heard a gun click several times while defendant hit the female victim with the gun. *Id.* The female victim sustained injuries to her hand which shielded her from defendant's attacks on her with the gun. *Id.* at 1375. Appellant's conviction for causing bodily injury to her with a deadly weapon was upheld. *Id.*

5. We observe that pointing a gun at a person can be a threat to cause serious bodily injury and could constitute a simple assault as an attempt by physical menace to put another in fear of imminent serious bodily injury. 18 Pa.C.S.A. § 2701(a)(3). *See, Commonwealth v. Trowbridge,* 261 Pa.Super. 109, 395 A.2d 1337, 1340 n. 8 (1978). We caution that pointing a gun at another may be aggravated assault under either §§ 2702(a)(1) or (a)(4), depending on the surrounding circumstances.

We recognize that at least one court has said that aggravated assault is not demonstrated where, during a struggle with a victim, defendant's gun clicks. *See, Commonwealth v. Savage,* 275 Pa.Super. 96, 418 A.2d 629, 632 (1980). *Savage* did not involve a sufficiency of the evidence challenge to the aggravated assault conviction and no clear indication that defendant was convicted under § 2702(a)(4). *Id.* at n. 7. 632. Further, such a statement is not supported in many other cases announced by this Court. *See, e.g., Commonwealth v. Bond,* 261 Pa.Super. 311, 396 A.2d 414, 416 n. 2. (1978) (while a challenge to the aggravated assault conviction was not addressed in the Court's opinion, the Court did state that the evidence was sufficient "to show an aggravated assault of" one of the victims who heard the gun clicking during a struggle with the defendant).

little or no injury to the victim. *Lopez; Rosado; Sanders.* Third, we view all the evidence in the light most favorable to the verdict winner, giving that party the benefit of all reasonable inferences to be drawn therefrom. Fourth, with respect to the intent requirement of each section, we examine the defendant's words and conduct to determine whether the record supports a finding of the requisite intent.[6]

¶ 25 The focus of our inquiry in Appellant's case is whether, in the circumstances of this case, defendant took a substantial step and demonstrated an intent to inflict serious bodily injury for purposes of § 2702(a)(1) or an intent to inflict bodily injury for purposes of § 2702(a)(4). *Alexander; Sanders.*

¶ 26 The trial court addressed this issue as follows:

It is clear from reviewing the testimony of the victim, Timothy McCrone, at pages 23 through 47 of the trial transcript that, from the victim's point of view, he was certainly justified in fearing for his life with a bayonet so close to his neck that if he turned his head he would have cut open his throat. Whether or not the gun was loaded is immaterial, as the bayonet attached to the gun was a deadly weapon in close proximity to a vital organ of the victim. Under either theory of aggravated assault that conduct along with the statement, "I just ought to kill you.", constitutes an intent to cause serious bodily injury.

Trial Court Opinion, 8/21/01, at 1.

¶ 27 Here, the record reflects that Appellant used a deadly weapon, *i.e.*, a loaded rifle with an attached bayonet. *Id.* The bayonet was placed against a vital part of the victim's body, *i.e.*, his throat. *Id.* If the victim had turned his head, his throat would have been cut open. *Id.* Appellant said, "I just ought to kill you.... Do you want to die today or tomorrow?" *Id.* Shortly thereafter, the victim escaped. *Id.*

¶ 28 The record supports the findings of the jury. The record reflects Appellant took a substantial step since the bayonet touched the victim's neck. The record also reflects an intent to seriously injure. Here, Appellant's words and conduct conveyed a present intent to kill. Also, Appellant did not release the victim; rather, the victim escaped. The fact that Appellant did not pursue the victim does not dissipate the fact that the circumstances at the critical moment were such that a jury could conclude that Appellant had an intent to cause serious bodily injury and an intent to cause bodily injury with a deadly weapon. Viewing the evidence in the light most favorable to the verdict winner, the Commonwealth, we conclude that the record supports the convictions of aggravated assault under §§ 2702(a)(1) and (a)(4).

¶ 29 Appellant next complains that the evidence was insufficient to convict him of driving under the influence of alcohol to a degree that rendered him incapable of safe driving under 75 Pa.C.S.A. § 3731(a)(1). In evaluating a challenge to the sufficiency of the evidence under Section 3731(a)(1), we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crime charged was established beyond a reasonable doubt. *Commonwealth v. Montini,* 712 A.2d 761, 767 (Pa.Su-

---

**6.** We note that, as the above illustrates, the case law upon which this Opinion is based post-dates the case law cited by our colleague in his dissent. We have analyzed all pertinent law on the subject. However, as we must, we follow the most recently announced appellate precedent on the issues presented.

per.1998). It is within the province of the fact finder to determine the weight to be given to the testimony and to believe all, part, or none of the evidence. *Id.* at 767–68.

75 Pa.C.S.A. § 3731(a)(1) provides:

§ 3731. **Driving under influence of alcohol or controlled substance**

(a) **Offense defined.**—A person shall not drive, operate or be in actual physical control of the movement of a vehicle in any of the following circumstances:

(1) While under the influence of alcohol to a degree which renders the person incapable of safe driving.

75 Pa.C.S.A. § 3731(a)(1).

¶ 30 To establish that one is incapable of safe driving for purposes of 75 Pa.C.S.A. § 3731(a)(1), the Commonwealth must prove that alcohol has substantially impaired the normal mental and physical faculties required to operate the vehicle safely. *Montini,* 712 A.2d at 767. Substantial impairment means a diminution or enfeeblement in the ability to exercise judgment, to deliberate or to react prudently to changing circumstances and conditions. *Commonwealth v. Kowalek,* 436 Pa.Super. 361, 647 A.2d 948, 950 (1994).

¶ 31 The trial court addressed this issue as follows:

As to issue number two, which is also a factual issue, being whether or not the Commonwealth presented sufficient evidence to prove that the defendant was guilty of driving under the influence of alcohol to a degree which rendered him incapable of safe driving, you have a refusal to take a BAC test, a strong odor of alcohol, bloodshot eyes, and defendant's admission that he had drank four beers approximately 40 minutes before driving his vehicle. There was also testimony as to the defendant traveling at a high rate of speed on a back winding road; and, of course, the prior incident that evening where he pointed a bayonet at the throat of a neighbor whom he hardly knew. The jury was certainly justified in finding the defendant guilty of driving under the influence under the above facts as supported by the above strong circumstantial evidence.

Trial Court Opinion, 8/21/01, at 1–2. We agree.

¶ 32 Our review of the record reflects that Pennsylvania State Police Trooper Michael Keyes testified that he was traveling east on Route 17 when he spotted a yellow pick-up truck he believed might be Appellant's because of an assault reported earlier that evening. N.T., 10/23/00, at 49. Appellant was travelling in the opposite direction. *Id.* Trooper Keyes turned his vehicle around and began pursuing Appellant's truck. *Id.* Trooper Keyes followed Appellant's truck on to Cherry Valley Road where Trooper Keyes was able to stop the vehicle. *Id.* Appellant got out of the truck and headed toward Trooper Keyes' vehicle when Trooper Keyes ordered Appellant to the ground. *Id.* at 51. Another Pennsylvania State Police Trooper, Gregory Wirth, arrived on the scene. N.T., 10/23/00, at 51. The troopers handcuffed Appellant, and arrested him. *Id.* at 52. Trooper Keyes testified that Appellant emitted a strong odor of alcohol. *Id.*

¶ 33 Trooper Wirth testified that he observed Appellant's vehicle as it came "flying" up the road at a high rate of speed. N.T., 10/23/00, at 63, 65. Trooper Wirth saw Trooper Keyes in pursuit. *Id.* at 63. Trooper Wirth turned around and pursued the two vehicles. *Id.* at 64. When Trooper Wirth arrived at the scene, he observed Appellant lying on the ground near the rear of the pickup truck. *Id.* Trooper Wirth detected a strong odor of alcohol on Appellant and noted that Appellant had

bloodshot eyes. *Id.* at 65. In response to an inquiry, Appellant stated that he had had four sixteen-ounce beers at the "Copper Frog" in a forty-minute period. N.T., 10/23/00, at 70. No field sobriety tests were conducted. *Id.* at 69–70. Appellant was asked to submit to a blood test, but refused. *Id.* at 70.

¶ 34 After the troopers placed Appellant in the police car, Trooper Wirth asked Appellant if he had any weapons. N.T., 10/23/00, at 66. Appellant responded that he had a case of beer in the car. *Id.* When Trooper Wirth repeated the question, Appellant stated, "I have shoes." *Id.* Trooper Wirth recovered a case of beer and a loaded rifle with eight rounds of live ammunition from Appellant's truck. *Id.* at 67.

¶ 35 Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, we conclude that the Commonwealth did prove that Appellant was driving while substantially impaired by alcohol. Appellant admitted to operating a motor vehicle after consuming four sixteen-ounce beers within forty minutes, appeared with bloodshot eyes, drove at a high rate of speed, gave inappropriate answers, and refused a blood test. Thus, the trier of fact could have found a diminution in the ability to exercise judgment or to react prudently to changing circumstances sufficient to establish that alcohol substantially impaired Appellant's mental and physical faculties required to operate a vehicle safely. *Montini; Kowalek.* The evidence is sufficient to sustain Appellant's conviction for driving under the influence of alcohol to a degree that he was rendered incapable of safe driving pursuant to 75 Pa.C.S.A. § 3731(a)(1). Appellant's claim lacks merit.

¶ 36 Appellant, finally, complains that the trial court abused its discretion in failing to sustain defense counsel's objection to the prosecutor's comment to the jury during closing argument. Appellant specifically complains that the prosecutor's description of Appellant as "the reason that our rights in this country to bear arms are threatened right now" was clearly intended to prejudice the jury against Appellant.

¶ 37 A prosecutor's remarks will not "constitute reversible error unless the unavoidable effect of such comment would be to prejudice the jury. Whether a reversal of judgment is required depends on whether the remarks made by the prosecutor are of such a nature that they would seriously threaten the jury's objectivity and deprive the accused of a fair trial." *Commonwealth v. Carter,* 537 Pa. 233, 643 A.2d 61, 76 (1994). Comments by a prosecutor during closing arguments must be considered in the context of the entire summation. *Commonwealth v. Johnson,* 719 A.2d 778, 790 (Pa.Super.1998), *appeal denied,* 559 Pa. 689, 739 A.2d 1056 (1999).

¶ 38 The trial court addressed this issue as follows:

As to issue number three, the defense argues that a mistrial should have been declared by the Court when defense counsel objected to the prosecutor's highly inflammatory comment to the jury in his closing argument wherein he stated that "The defendant is a dangerous man. He's the reason that our rights in this country to bear arms are threatened right now. Like him", (N.T. of Trial, 99). It should be pointed out that when trial counsel objected to that argument, this Court asked the attorneys to approach the bench and thereafter the Assistant District Attorney continued with his argument in a proper

manner. Considering the overwhelming evidence against the defendant in this case, such an isolated remark by the prosecutor in closing argument did not substantially compromise the rights of the defendant to a fair trial under the totality of the circumstances of this case. Trial Court Opinion, 8/21/01, at 2. We agree.

¶ 39 Our review of the prosecutor's summation reflects that this single comment by the prosecutor in the context of the entire summation that was 11 pages in length does not warrant reversal or a new trial. The single remark by the prosecutor was not of such a nature that it would seriously affect the jury's objectivity or deprive Appellant of a fair trial. *Carter.* Thus, the prosecutor's comment did not result in prejudice to Appellant. Appellant's final claim fails.

¶ 40 Accordingly, on the basis of the foregoing, we affirm Appellant's judgment of sentence.

¶ 41 Judgment of sentenced affirmed.

¶ 42 BENDER, J. files a Concurring and Dissenting Opinion.

## CONCURRING AND DISSENTING OPINION BY BENDER, J.:

¶ 1 It has often been said that our system of criminal justice is founded upon a common law tradition that deems it better that a guilty man go free than an innocent man stand convicted. Justice Harlan expressed this sentiment cogently while concurring in the case of *In re: Winship,* 397 U.S. 358, 380, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). There he stated "I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." Ostensibly serving this fundamen-

tal value, since common law days virtually all jurisdictions in this country have placed before the sovereign a theoretically stringent evidentiary hurdle prior to allowing conviction and criminal sanction. That hurdle, of course, is the familiar burden of proof in criminal cases, beyond reasonable doubt. The primary method employed to test whether the burden of proof has been met in a particular case is a challenge of the sufficiency of the evidence.

¶ 2 Of course, virtually all who toil in the criminal law arena are familiar with the primary recitation regarding the sufficiency of the evidence. This statement of law holds that the:

> Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. *Commonwealth v. Karkaria,* 533 Pa. 412, 625 A.2d 1167 (1993).

*Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745, 751 (2000). Moreover, appellate courts are also keenly aware of, and quick to quote, the standard of reviewing a sufficiency challenge:

> When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. *Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630 (1991).

*Widmer.* Unfortunately, an undue focus on the above legal principles has seemingly led the courts, particularly the appellate courts, to lose sight of the equally applicable corollaries to the above:

> Where the evidence offered to support the verdict **is in contradiction to the physical facts, in contravention to human experience and the laws of na-**

ture, then the evidence is insufficient as a matter of law. *Commonwealth v. Santana,* 460 Pa. 482, 333 A.2d 876 (1975).

*Widmer.* (Emphasis added.) Perhaps more importantly, while the factfinder is enabled to draw inferences from the proven facts:

> it is just as important to remember that "the inferences must flow from facts and circumstances proven in the record, **and must be of 'such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt.'** *Commonwealth v. Clinton,* 391 Pa. 212, 219, 137 A.2d 463, 466 (1958). The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fall even under the limited scrutiny of appellate review."

*Commonwealth v. Scott,* 409 Pa.Super. 313, 597 A.2d 1220, 1221 (1991)(end citations omitted)(emphasis added).

¶ 3 Special attention should be paid to the terminology "such volume and quality" in the above quotation. The factfinder, whether it be jury or judge, was never meant to be empowered with the ability to draw any conceivable or possible inference from the proven facts. The inferences necessary to convict are supposed to be of sufficient "quality." This implies that the inferences must be reasonable, logical and consistent with human experience. Moreover, the "volume" of the inferences must be substantial enough to satisfy the supposedly applicable burden of proof. That is to say, the proposition of the accused's guilt should not be merely a possibility, nor a proposition that is slightly more likely than not. Rather, the evidence should tip the scales strongly toward that proposition. Read together, the above quotations should unequivocally establish

that while juries are assigned the task of "finding facts" and, in doing so, have considerable latitude in weighing the credibility of witnesses, in assessing the evidence and deducing pivotal propositions from the facts, there are still limitations upon their factfinding function. Assigning the task of factfinding to a jury is not the same as handing the jury license to make leaps of logic and flights of fancy that would make famed daredevil Evel Knievel an envious man. The factfinding function still must pass a litmus test of reason and logic to ensure that conviction rests upon evidence that proves guilt **beyond reasonable doubt.**

¶ 4 When one breaks down the elements of the offense of aggravated assault, it becomes clear that as Appellant did not inflict actual injury upon Mr. McCrone, his conviction necessarily rests upon the jury's conclusion that he attempted to do so. This in turn requires reaching the conclusion that Appellant took a substantial step toward that end **with the intent** to inflict serious bodily injury. Admittedly, in theory at least, proving what is inside someone's mind is a difficult task and often requires reliance upon circumstantial evidence. However, the fact that a proposition is difficult to prove does not alleviate the burden of the Commonwealth to prove the element beyond reasonable doubt. There exists no explicit special exemption from the applicable burden of proof for difficult-to-prove elements of an offense. Consistent with the above, a jury should not be permitted, in such circumstances, to simply assume or guess what is in the mind of the defendant. The Commonwealth should be held to the same burden of proof, beyond reasonable doubt. To allow less, allows conviction on a lesser standard than beyond reasonable doubt, a constitutionally repugnant result.

¶ 5 Even before one considers the negative inference the whole of the encounter produced, the evidence in the present case should be recognized as insufficient to establish guilt beyond reasonable doubt. Appellant accosted Mr. McCrone with a loaded rifle that was also equipped with a bayonet. Appellant grabbed Mr. McCrone and positioned the blade of the bayonet to Mr. McCrone's throat. Appellant then stated "You're one of them, ain't you?" "I just ought to kill you ... Do you want to die today or tomorrow?" N.T. Trial, 10/23/00, at 32. The Majority finds that placing the bayonet to Mr. McCrone's throat was a "substantial step" toward accomplishing the intended result, to inflict serious bodily injury or death. However, this step is insufficient by itself to support the conviction. It was also necessary that Appellant take the step with intent to slash or stab Mr. McCrone with the bayonet.[7] Yet, since Appellant did not actually inflict injury, or take an overt step toward that end, i.e., making a slashing or stabbing motion, the conviction necessarily rests upon an assumption that Appellant possessed such intent. The Majority finds evidence of intent in Appellant's words. However, those words do not convincingly establish a present intent to kill or injure. Appellant did not state that he was going to kill Mr. McCrone, Appellant stated "I just **ought to** kill you." In common usage, the phrase "ought to" often connotes a sense that one "should" act in a particular way, or is justified in taking a certain action, but will not. Appellant then asked Mr. McCrone if he would like to die today or tomorrow, suggesting that Appellant had not yet formed a precise and present intent to injure Mr. McCrone.

¶ 6 Additionally, even had Appellant expressed a current intent to kill Mr. McCrone, without an overt act toward that end, one cannot be certain whether Appellant truly meant it or was merely trying to scare Mr. McCrone. Human experience teaches that people make "empty threats" all the time; threats which are made out of anger, or exasperation, but which are devoid of a present intent to carry them out, even those to kill people. Indeed, if every person whose life had been threatened actually met the threatened demise, the world would certainly be a less populated place. Absent other evidence that tips the scales greatly in favor of establishing that Appellant actually intended to inflict injury, the verdict is supported only by assumption and conjecture. In other words, mind reading. Is this really proof beyond reasonable doubt?

¶ 7 In reality, the actions of Appellant are just as consistent with an intent to scare or intimidate Mr. McCrone as they are to actually injure him. In effect, one could argue that within the factual context of this case there exists a theoretical continuum of criminal behavior in which first resides intimidation or terrorization, then actual attempt to injure, then actual infliction of injury. The Commonwealth conclusively proved intimidation and terrorizing, but no more. Indeed, when the elements of the lesser offenses of simple assault and terroristic threats are compared to the evidence and then contrasted with the ele-

---

7. The trial court speculates that the bayonet was placed so close to Mr. McCrone's neck that had he turned his head, his throat would have been cut. The Majority then cites this point as supporting the conviction. Assuming that this was true, it still does not establish intent to inflict serious bodily injury. Had injury resulted in this fashion it would have supported the conviction for aggravated assault as that conviction can result when serious bodily injury is inflicted recklessly. Certainly placing the bayonet to Appellant's throat constituted a "reckless" act. However, it does not prove that there was an intent to cut Mr. McCrone.

ments of aggravated assault in light of the evidence, the degradation in the quantity of proof and the degree of uncertainty that is inherent in the verdict is revealed. Few would question that Appellant's words and actions were sufficient to cause Mr. McCrone to fear for his life and since one is presumed to intend the natural consequences of his acts,[8] the elements necessary to convict for both simple assault and terroristic threats[9] are established convincingly without need for equivocation, reaching or assumption. In other words, those convictions were proven beyond reasonable doubt. The same cannot be said of the conviction requiring proof of intent to inflict serious bodily injury, which requires a variety of presumption or assumption, conjecture and speculation, to reach the verdict delivered.

¶ 8 Mentioned earlier in this Concurring and Dissenting Opinion was the term negative inference. An assessment of the entire episode reveals just how much of a stretch the guilty verdict truly was. Indeed, when the facts of the present case are digested, the essential factual inquiry comes sharply into focus. Appellant possessed ample opportunity to inflict serious bodily injury upon his neighbor had he so desired, or to at least take an unmistakably overt step toward inflicting serious bodily injury. Yet, no such injury was actually inflicted, nor was an overt step to injure undertaken. As such, logically speaking, the possibilities to explain this

circumstance are reduced to two. Either Appellant initially intended to hurt Mr. McCrone but at the moment of truth had a merciful change of heart or qualm of conscience and decided not to hurt his neighbor after all, or Appellant never possessed the intent to inflict serious bodily injury in the first place. No other reasonable possibilities exist. The first possibility would support the conviction in question, the second would not.

¶ 9 That Appellant had ample opportunity to inflict serious bodily injury upon Mr. McCrone cannot be rationally contested. In the first instance, Mr. McCrone was unaware of Appellant's presence when Appellant first grabbed Mr. McCrone from behind. Thus, had Appellant actually possessed a desire to inflict serious bodily injury, instead of grabbing and terrorizing Mr. McCrone, Appellant could have stabbed him with the bayonet, hit him with the butt of the rifle or shot him point blank.[10] Second, Appellant grabbed Mr. McCrone and placed the bayonet blade to his throat holding Mr. McCrone in that position long enough to have the verbal exchange which the Majority finds so damning. Although seeming like "an eternity" to Mr. McCrone, the time frame was considerably more brief. Yet, the time Mr. McCrone was in Appellant's grasp still clearly provided Appellant sufficient time to do considerable harm to Mr. McCrone, had that been Appellant's desire. Appellant had yet another opportunity to inflict

---

**8.** *Commonwealth v. Cannady,* 404 Pa.Super. 215, 590 A.2d 356, 358 (1991).

**9.** § 2701. **Simple assault**
   (a) OFFENSE DEFINED.—A PERSON IS GUILTY OF ASSAULT IF HE:
   (3) attempts by physical menace to put another in fear of imminent serious bodily injury
  § 2706. **Terroristic threats**
   (a) OFFENSE DEFINED.—A PERSON COMMITS THE CRIME OF TERROR-

ISTIC THREATS IF THE PERSON COMMUNICATES, EITHER DIRECTLY OR INDIRECTLY, A THREAT TO:
   (1) commit any crime of violence with intent to terrorize another
18 Pa.C.S.A. §§ 2701 and 2706.

**10.** Trooper Wirth testified that the gun was loaded when it was taken from Appellant upon his capture.

serious bodily injury, or death, when Mr. McCrone ran off up the road and presented an easy target for Appellant to shoot.[11] Yet, no shot was fired.

¶ 10 Thus, viewed in context, the jury's verdict can only reflect a conclusion that Appellant acted with intent to injure but suddenly abandoned his intended plan. The jury's verdict begs the question; upon what proof does the jury's conclusion rest? What evidence demonstrates that of the two competing propositions, the one suggesting that Appellant abandoned his earlier intent to inflict serious bodily injury or death was far more probable than the proposition that Appellant never intended to carry out the threat, as proof beyond reasonable doubt would supposedly demand? The answer of course, is none. The only way to reach the verdict rendered was to guess what Appellant's true intent was. If the jury is guessing, conviction does not rest upon proof beyond reasonable doubt. In the best case scenario the jury understood the inquiry before it, and simply speculated that Appellant had the requisite intent but apparently abandoned the plan. More likely, the jury failed to comprehend the analytical task placed before it and returned a guilty verdict on all charges because Appellant did a bad thing and seemed like an evil man. Neither scenario should be countenanced on appeal. While Appellant undeniably acted egregiously on the night in question, this fact should not provide license to convict for crimes greater than that which the evidence truly established.

¶ 11 The above analysis is not simply irrefutable logic; it also has support in the law. The most compelling authority is provided by the case of *Commonwealth v. Mayo*, 272 Pa.Super. 115, 414 A.2d 696

(1979), the facts of which are strikingly similar to the present case. In *Mayo:*

> Miss Geri Lynn Styk testified that on the morning of February 12, 1977, she was present in a basement apartment which she occupied with her daughter and a roommate, Patty Snyder. At approximately 3:00 a.m., appellant telephoned and asked Miss Styk if she knew of Miss Snyder's whereabouts. Miss Styk answered in the negative and appellant informed her that he would be coming to the apartment. Some ten minutes later, appellant arrived with a companion, but both were denied entrance when Miss Styk again insisted that she was ignorant of Miss Snyder's location. Appellant nevertheless opened the door and stepped into the apartment with his companion. After the two intruders were seated for some moments, Miss Styk accused them of taking her wallet and demanded that they leave. Appellant then grabbed Miss Styk by the hand and forcibly led her to the kitchen. There, he pulled a six inch long steak knife out of the dish rack, placed it to the victim's throat, and said, "Do you know what I do to people that accuse me of doing things that I don't do? ... I kill them." Appellant proceeded to scratch some letters on the victim's chest with the knife. No blood was drawn, and the marks disappeared later that evening.

*Id.* at 698.

¶ 12 Against the above factual backdrop, Mayo challenged the sufficiency of the evidence to support the jury's verdict of guilty of aggravated assault. In reversing the conviction on appeal, this Court, after concluding that Miss Styk had not suffered serious bodily injury from the assault,

---

**11.** Mr. McCrone testified that it occurred to him as he was running away that he better duck into the woods "because he could shoot me in the back because I was on the blacktop road and the blacktop road was lit up pretty good." N.T. Trial, 10/23/00, at 33.

turned its attention to the attempt to injure element of aggravated assault.

Our analysis is not concluded, however, for the trial court emphasized in its opinion that it believed the requisites of the crime were satisfied because appellant had *attempted* to cause bodily injury. Again, we are constrained to disagree. "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a). While it is well established that intent may be proven by direct or circumstantial evidence, ... there is simply no evidence, circumstantial or otherwise, to indicate that appellant attempted to inflict bodily harm, as that term is defined by the Crimes Code.

\* \* \*

Although appellant was certainly more physically powerful than his victim, and at least suggested the possibility of her death, we view the crucial fact to be his failure to pursue his obvious opportunity to inflict considerable pain or injury on Miss Styk. Appellant's actions all point decisively to an intent not to inflict bodily injury, but to frighten and/or humiliate Miss Styk, a design which was in fact eminently successful.

*Id.* at 702.

¶ 13 In reversing the conviction, *Mayo* focused upon the fact that the assailant's acts never went beyond intimidation and the imposition of fear despite an apparent opportunity to inflict harm. Some might assert that in stating, "Appellant's actions all point decisively to an intent not to

inflict bodily injury, but to frighten and/or humiliate Miss Styk, a design which was in fact eminently successful," *id.* at 703, the *Mayo* panel appears to have made a determination of fact and substituted its own assessment for the jury's. However, this is not really true. The *Mayo* panel seemingly recognized that the proposition that Mayo never intended to injure the victim was at least as inviting, based upon human experience, as was the possibility that, at the last minute, Mayo had a change of heart or uprising in conscience and decided not to act upon the original intent to injure. As stated earlier, while reasonable inferences must be drawn in the Commonwealth's favor, **the inferences must be of "such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt."** *Scott, supra,* 597 A.2d at 1221. If an inference is merely one of two or more possibilities of roughly equal appeal or probability, then the proposition has not been proven beyond reasonable doubt and the verdict is a product of speculation and conjecture.[12] Thus, the *Mayo* panel merely overturned impermissible speculation by the jury that in menacing Miss Styk Mayo also intended to go further and inflict bodily harm upon her. Absent additional evidence of that intent, the circumstances simply did not prove anything more than an intent to intimidate and terrorize. Thus, the verdict could not stand.

¶ 14 Similarly, in *Commonwealth v. Savage,* 275 Pa.Super. 96, 418 A.2d 629 (1980), we concluded that an aggravated assault conviction could not be sustained merely upon evidence that the defendant had

---

12. "When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty." *Commonwealth v. Woong Knee New,* 354 Pa. 188, 47 A.2d 450, 468 (1946). Quoted with approval in *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687, 692 (1977).

pointed a gun at the victim. We stated, " 'pointing a gun at Mr. Gould ... in ... a threat to cause serious bodily injury,' could constitute a simple assault as an 'attempt by physical menace to put another in fear of imminent serious bodily injury.' 18 Pa. C.S. § 2701(a)(3). It could not, however, constitute an aggravated assault." *Id.* at 632. Although the *Savage* panel does not elaborate upon its conclusion, the reasoning appears clear enough. A threat to cause serious bodily injury, by itself, is insufficient to establish aggravated assault. It is further notable that the act of pointing a weapon is qualitatively as threatening as positioning a bayonet blade next to another's throat. The larger point that can be deduced from *Savage* is that a "threatening" action does not conclusively establish intent to follow through on the threat.

¶ 15 In contrast to *Savage*, convictions for aggravated assault were found supportable where, in addition to pointing a gun at another, "clicks" were heard. *Commonwealth v. Chance*, 312 Pa.Super. 435, 458 A.2d 1371 (1983); *Commonwealth v. Bond*, 261 Pa.Super. 311, 396 A.2d 414 (1978). The significant difference from *Savage* is the addition of clicking, which signified that the assailant, in addition to pointing the weapon, also pulled the trigger, but fortunately the gun misfired. The gun's misfiring aside, the affirmative step of attempting to actually discharge the weapon is the critical evidence additional to pointing the weapon that allowed the finding that an attempt had been made to inflict serious bodily injury.

¶ 16 There is considerable coincidence in the facts of *Mayo* and the present case. Both cases involved a threat to kill and the menacing of the victim with a weapon. Indeed, if anything, it could be argued that there was a greater quantum of evidence to inflict harm in *Mayo*, since Mayo, in fact, used the knife on the victim, albeit only to inflict superficial injury or scratching. Here, although Appellant placed the bayoneted rifle next to Mr. McCrone's throat, he did not even superficially cut Mr. McCrone. Importantly, however, as in *Mayo*, there was no overt step taken to actually injure Mr. McCrone. Moreover, like *Mayo*, Appellant seemingly had ample opportunity to inflict harm had he truly intended to do so. That he did not follow through on his threatening words and acts cannot be overlooked. In short, Appellant's conviction for aggravated assault rests upon assumption, conjecture and speculation, not proof beyond reasonable doubt. It should be reversed here.

¶ 17 The Majority's primary response to the above analysis is set forth in footnote 6, and suggests that this Dissent is based upon outdated law, as opposed to the more recent precedent the Majority follows. However, the cases most pivotal to the analysis set forth above, *Mayo* and *Savage*, have not been reversed or overruled and, thus, remain "good law." Indeed, the most recent case from this Court discussing the above matter not only found the evidence insufficient to support a conviction for aggravated assault, but implicitly reaffirmed *Mayo*. In *Commonwealth v. Repko*, 817 A.2d 549 (Pa.Super.2003), under facts rather similar to those found here,[13] a panel of this Court concluded that

13. The facts relevant to the discussion follow: Ms. Hiller and Ms. Bench drove to appellant's home to try to defuse the situation. When they got there, George had not yet arrived. Appellant met the women's vehicle as it pulled into his driveway. He point-

ed a gun at Ms. Bench from a distance of 25 feet and told her to leave his property or he would shoot her in the head. Ms. Bench complied, walking away from the vehicle, down appellant's driveway to the road where she waited while Ms. Hiller and ap-

although a simple assault by physical menace had been demonstrated, the evidence was insufficient to support a conclusion that the assailant had an actual intent to injure. We stated:

> Instantly, appellant did not fire his weapon at Ms. Bench and Ms. Bench clearly did not sustain any bodily injury. Thus, in order for appellant to be convicted under section 2702(a)(4), the Commonwealth was required to prove that appellant attempted to intentionally cause bodily injury to Ms. Bench with his weapon by taking a substantial step toward that end. n4 This court has previously held:
>
>> It would appear that the mere act of pointing a gun at another person is not sufficient to support a conviction for aggravated assault [under section 2702(a)(4) ]. Something more is required in order to establish a specific intent to cause injury to that person at whom the gun is being pointed.

*Id.* at 555 (quoting *Commonwealth v. Sanders*, 426 Pa.Super. 362, 627 A.2d 183, 187 (1993)). With the above a guiding principle, the panel ultimately agreed with the trial court, which, to its credit, had concluded post-trial that the evidence was insufficient to support the conviction for aggravated assault. We quoted the following passage from the trial court's opinion:

> Bench's testimony was not sufficient to convict Repko of aggravated assault. *In Commonwealth v. Chance*, 312 Pa.Super. 435, 458 A.2d 1371 (1983), the Court held that a defendant's action of pointing a gun at his victim, together with the evidence that the victim heard the gun click several times while he was struggling with the defendant, was sufficient to sustain a conviction of aggravated

assault under 18 Pa.C.S. § 2702(a)(4). But in *Commonwealth v. Mayo*, 272 Pa.Super. 115, 414 A.2d 696 (1979), evidence that the defendant wielding a butcher knife threatened the victim and lightly scratched her chest with the knife was not sufficient to establish either that bodily injury had been inflicted or that defendant had attempted to cause bodily injury with the knife, since defendant had failed to pursue an obvious opportunity to inflict considerable pain or injury to the victim.

> Our analysis leads us to conclude that the factual scenario presented in the record before us is clearly more akin to the facts in *Mayo* than those presented in *Chance*. There is no evidence that Repko attempted to fire his weapon. Although he apparently had ample opportunity to shoot Bench, since she was in a well-lit area and at a distance of only some 25 feet, he did not. Repko's verbal and physical actions emphatically indicated an intent to frighten and scare Bench away from his home (which was successful) rather than an attempt to inflict serious [sic] bodily injury upon her. His act of pointing the weapon at Bench, accompanied by threats to kill her, was sufficient to convict him of the crime of simple assault under Section 2701(a)(3), but it clearly did not rise to the level required for a conviction for aggravated assault under Section 2702(a)(4). See also, *Commonwealth v. Sanders*, 426 Pa.Super. 362, 627 A.2d 183 (1993).

*Repko*, at 555–56. Thus, the most recent pronouncement of this Court on the matter not only reaffirms *Mayo* and other earlier, yet relevant, precedent, but it also indicates that menacing a victim with a weap-

---

pellant continued to talk. Sometime thereafter, Ms. Bench came back down the driveway toward the car and appellant again

pointed a gun at her and threatened to shoot. She again left.

*Repko, supra,* at 551.

on, even when accompanied with explicit threats, is insufficient to establish intent to injure.

¶ 18 Moreover, for the most part, the cases relied upon by the Majority do not address *Mayo* or *Savage* and possess significant factual differences. Thus, there is no reason to view the authority of *Mayo* and *Savage* as compromised. For example, *Commonwealth v. Lopez,* 439 Pa.Super. 625, 654 A.2d 1150 (1995), cites *Mayo* to support a definition of attempt but does not discuss the facts of *Mayo* or its holding. However, this is understandable since *Lopez* involved the firing of several shots into a residence, as did *Commonwealth v. Rosado,* 454 Pa.Super. 17, 684 A.2d 605 (1996). It is very logical to presume an intent to inflict serious bodily injury when one actually discharges a gun into a residence and, of course, the mere fact that no one was injured does not diminish the intent of the shooter. Thus, nothing in either *Lopez* or *Rosado* impairs the *Mayo/Savage* precedent.

¶ 19 The cases of *Commonwealth v. Fierst,* 423 Pa.Super. 232, 620 A.2d 1196 (1993), *Commonwealth v. Rodriquez,* 449 Pa.Super. 319, 673 A.2d 962 (1996), *Commonwealth v. Roche,* 783 A.2d 766 (Pa.Super.2001), and *Commonwealth v. Kibe,* 258 Pa.Super. 353, 392 A.2d 831 (1978), all involved a physical assault, i.e., punching, beating or kicking of the victim. Of course, in the case of punching, kicking or beating a victim, the question is not whether there was an intent to injure, but whether there was an intent to inflict serious bodily injury, or a less serious injury. Often, the nature or violence of such a physical attack will allow the inference that the assailant intended to inflict serious bodily injury, even if such injury did not result. As such, the holdings in these cases are clearly distinguishable from *Mayo/Savage* and do not impair the precedential value of those cases.

¶ 20 Lastly, there is *Commonwealth v. Sanders,* 426 Pa.Super. 362, 627 A.2d 183 (1993), which mentions *Mayo* and *Savage* and capsulizes the facts of each. Like the present case, *Sanders* involved the menacing of a victim with a gun and the offering of threats, yet the conviction was upheld. Admittedly, *Sanders* could be viewed as offering a contrary result to *Mayo* and *Savage.* However, *Sanders* involved the actions of an individual in response to an invitation to engage in a fight. As such, as opposed to a situation where the assailant was in a dominant position over a relatively helpless and compliant victim there was an active combatant involved who might be presumed to have an intent to injure the assailant. Thus, conceivably, this circumstance might create a greater inference that the assailant possessed an intent to actually inflict injury as opposed to simply menacing the victim. However, to the extent the two cases are deemed in conflict, it cannot be asserted that *Mayo* and *Savage* are no longer relevant. Since those cases preceded *Sanders,* the *Sanders* panel was without authority to disregard the earlier precedent and should have adhered to it. Thus, to the extent the cases are deemed in conflict, *Sanders* should be viewed as an unauthorized break from controlling precedent and criticized rather than perpetuated.

¶ 21 Despite the above, there is another notable fact distinguishing *Sanders* from *Mayo* and *Savage.* Thus, even giving full credence to *Sanders,* it does not compel the Majority's result. In *Sanders,* the victim grabbed the gun from the assailant shortly after the assailant menaced the victim. As such, the negative inference discussed above was removed. In reality, the verdict in *Sanders* is still based upon a fair amount of speculation, as the intent to

do anything more than menace the victim is strictly a matter of presumption and is not conclusively proven by the attendant circumstances. That is, although it could be argued that had the victim not wrested the gun from the assailant, he would have discharged it in the victim's direction, the opposite is true as well. The assailant may have had no true intention to discharge the weapon and there is no way either we, or a jury, could know for sure what was in the assailant's mind. Thus, the verdict in *Sanders* was clearly based on a certain amount of speculation. However, at least the conclusion there was far less speculative than the one occurring here, where nothing stopped Appellant from harming Mr. McCrone had he truly desired to do so.

¶ 22 The Majority further suggests that *Mayo* is "likely limited to the unique facts of its case." Majority Opinion, at 778 n. 3. However, contrary to this point of view, *Repko* implicitly gives ongoing validity to *Mayo*. Moreover, to the extent the Majority suggests *Mayo* should be limited to its "unique facts," this assertion runs contrary to basic appellate jurisprudence which holds that precedent most similar in fact should be accorded the greatest weight. *See generally*, Standard Pennsylvania Practice § 2:245. Rather than rely upon cases involving the threatening and menacing of a victim where the threat is not followed through, the Majority chooses to rely mostly upon cases involving physical beatings or cases where a gun was actually discharged. These cases involve overt acts to injure and, thus, offer compelling evidence of an intent to injure; the cases relied upon here do not.

¶ 23 Indeed, if the facts of the cases relied upon by the Majority were altered slightly to be qualitatively analogous to the present case, the degree of reaching in their analysis is revealed. That is, the Majority relies upon cases where shots were fired into a residence. Query: had the assailants merely stood outside the residence and shouted threats to shoot into the residence while holding the gun, would the evidence be deemed sufficient to convict for aggravated assault? I think not. Yet, to extend the Majority's analysis, the assailants could be found guilty because having taken a threatening posture and having actually made a threat to fire, the jury would be free to surmise that the assailants actually intended to inflict serious bodily injury. The fact that they did not would be of no import.

¶ 24 The Majority further relies upon cases involving physical beatings. Query: would an aggravated assault conviction be allowable where a would-be assailant collared another, reared back with his hand, stated "why, I ought to pulverize you," but who then brings his hand down? That scenario is the functional equivalent of the one that unfolded here, *i.e.*, the present ability to inflict injury, the threat to do so, but no overt step taken to do so.

¶ 25 When the Majority's argument is thoroughly analyzed, it becomes clear that it is derived from cases that do not involve the same circumstance presented here, or offer a less comprehensive analysis of the issue before us, or have overlooked relevant precedent in their discussion of intent to injure. The above discussion should prove that the jury's verdict rests upon either speculation or a disregard of the analytical task presented them. We should take this opportunity to reaffirm the reasonable doubt standard upon which our legal heritage is founded rather than extending unwarranted deference to the jury.

¶ 26 Appellant secondarily challenges the sufficiency of the evidence to support the conviction for driving under the influ-

ence of alcohol to a degree that rendered him incapable of safe driving.[14] As above, I agree that the evidence was insufficient to support this conviction as well.

¶ 27 In the present case, there was undeniable evidence, including his own admission, that Appellant was operating a motor vehicle after consuming alcohol. However, there is a lack of evidence that Appellant was under the influence of alcohol to a degree that rendered him **incapable of safe driving.** Of course, the operative phrase in the preceding sentence is incapable of safe driving. Under the terms of the Motor Vehicle Code, it is not enough to merely establish that Appellant drove after consuming alcohol. Nor would establishing that Appellant drove in an unsafe manner after consuming alcohol sufficiently prove the offense.[15] Rather, the Commonwealth must prove that the driver was under the influence of alcohol to a degree that he was rendered **incapable** of safe driving. To establish that one was incapable of safe driving for purposes of 75 Pa.C.S.A. § 3731(a)(1), the Commonwealth must prove that the consumption of alcohol has substantially impaired the normal mental and physical faculties required to operate the vehicle safely. *Commonwealth v. Montini,* 712 A.2d 761 (Pa.Super.1998). "Substantial impairment, in this context, means a diminution or enfeeblement in the ability to exercise judgment, to deliberate or to react prudently to changing circumstances and conditions."

*Commonwealth v. Kowalek,* 436 Pa.Super. 361, 647 A.2d 948, 950 (1994).

¶ 28 I understand that in this case the police were faced with attenuating circumstances and a defendant who did not submit to a blood test. Nevertheless, such circumstances do not alleviate the need for the Commonwealth to prove every element of the offense charged. Moreover, while the elements of the offense of driving under the influence can be proven circumstantially, just as in the discussion relating to aggravated assault, the evidence must prove the necessary elements beyond reasonable doubt. In my opinion, the Commonwealth's evidence fails to meet the necessary threshold of proof.

¶ 29 As stated above, it is clear that Appellant consumed alcohol prior to being stopped in his vehicle. Indeed, according to Trooper Wirth, Appellant admitted to consuming four sixteen-ounce beers at the Copper Frog in a forty-minute period. However, the Commonwealth provided no time frame for when the beers were consumed relative to the stop and provided no evidence of Appellant's weight and the probable absorption rates. As such, this evidence proved only that Appellant had been drinking, at some point, prior to driving, a fact that was already well established. This evidence does not even provide any real insight into Appellant's probable Blood Alcohol Content at the time he was driving, from which, conceivably, an inference or presumption could have been drawn relating to Appellant's ability to

---

14. **§ 3731. Driving under influence of alcohol or controlled substance**

    (a) **Offense defined.**—A person shall not drive, operate or be in actual physical control of the movement of a vehicle in any of the following circumstances:

    (1) While under the influence of alcohol to a degree which renders the person incapable of safe driving.

75 Pa.C.S.A. § 3731(a)(1).

15. Alone, proof that one consumed alcohol does not prove that one is under the influence of alcohol to degree rendering the party incapable of safe driving. Nor does proof that one drove in an unsafe manner prove that one was incapable of driving in a safe manner. Indeed, one may, and often does, witness numerous instances of unsafe driving everyday on the roadway that have nothing to do with consumption of alcohol.

safely operate a motor vehicle.[16]

¶ 30 Beyond the above evidence, Trooper Keyes testified that Appellant had a "strong odor" of alcohol upon him when he stopped him but did not otherwise testify to observing any signs of intoxication. N.T. Trial, 10/23/00, at 52. Notably, upon cross-examination, Trooper Keyes admitted that he observed no staggering, stumbling, swaying or falling. *Id.* at 55. Lastly, Trooper Keyes testified that Appellant was coherent. *Id.*

¶ 31 Trooper Wirth also opined that Appellant emitted a "strong odor of alcohol" and added his observation that Appellant's "eyes were bloodshot."[17] *Id.* at 65. Trooper Wirth further detailed the somewhat puzzling exchange he had with Appellant where he asked him if he had any weapons and Appellant first responded "a case of beer," then "shoes." However, Trooper Wirth offered no other testimonial evidence that demonstrated the degree to which Appellant was under the influence or the effects the consumption was having upon his physical capabilities. As such, there was no evidence that Appellant's coordination, motor skills or ability to perform physical tasks was compromised or reduced by his consumption of alcohol let alone diminished to a point that he was incapable of safe driving.

¶ 32 With respect to Appellant's driving prior to being stopped, Trooper Keyes testified that the only "unsafe driving" he observed was Appellant traveling at "a high rate of speed for the roadway." *Id.* at 56. Similarly, Trooper Wirth indicated that Appellant "was flying" when he went past him on Cherry Valley Road. However, neither Trooper testified to any other "unsafe driving" by Appellant.

¶ 33 While the Commonwealth would argue that Appellant's driving supports the conviction, Appellant's observed driving does not provide any real evidence that Appellant was **incapable** of driving safely. Indeed, in its entirety, the testimony regarding Appellant's driving tends to prove the opposite. Human experience teaches that numerous drivers voluntarily drive in excess of the speed limit. Are we to presume that the many motorists that exceed the speed limits are not only intoxicated but were also incapable of controlling

**16.** As observed by Justice Zappala, while concurring in *Commonwealth v. McCurdy*, 558 Pa. 65, 735 A.2d 681, 687 (1999), "[a] plethora of considerations go into determining how probative a post-driving BAC test is of a person's condition while he or she had been driving. Those considerations include, *inter alia*, the persons height, weight, metabolism, what they had eaten and how long ago, when they consumed their last drink, and how many drinks they consumed within a particular time frame. See Robert J. Schefter, Under the Influence of Alcohol Three Hours After Driving: The Constitutionality of the (a)(5) Amendment to Pennsylvania's DUI Statute, 100 Dick.L.Rev. 441, 465–466 (1996).". Thus, Appellant's admission that he had consumed four sixteen-ounce beers in a forty-minute period, absent additional information, is probative of very little.

To illustrate, if Appellant were 200 pounds, according to readily available blood-alcohol-level charts, his BAC, at a maximum, would approximate .1, before taking into consideration any "burning" of the alcohol by his body. If Appellant were 240 pounds, his BAC would be a maximum of just over .08. Conversely, if Appellant were 160 pounds, he would be well over .1. The same reference materials indicate that alcohol is "burned up" at a rate of .015 per hour. (Source: Chart–National Clearinghouse for Alcohol and Drug Information.) Of course, a BAC of .1 is the level in Pennsylvania when an operator of a motor vehicle is deemed to be legally incapable of safe operation. 75 Pa.C.S.A. § 3731(a)(4).

**17.** With respect to the odor of alcohol and its significance in determining intoxication Trooper Wirth testified "[t]hat an odor in and of itself means nothing." N.T. Trial, 10/23/00, at 73.

their speed due to their alcohol consumption? While such driving may have conceivably exposed Appellant to criminal liability for provisions relating to exceeding posted speed limits or driving too fast for conditions, this fact does not demonstrate that Appellant lacked the capability to drive within the posted speed limits or lacked the capability to drive safely. Appellant, like many a driver, may very well be an inpatient or habitually fast driver, or perhaps Appellant observed Trooper Keyes' vehicle behind him and was attempting to elude capture. Either of these very plausible scenarios would negate the proposition that Appellant drove fast because alcohol had impaired his judgment or rendered him **incapable** of controlling his physical actions.

¶ 34 In contrast, however, Trooper Keyes testified to following Appellant for a distance of up to two miles. *Id.* at 50. Notably, other than Appellant's rate of speed, Trooper Keyes testified to no other remarkable observations relating to the way the vehicle was driven or an inability to maintain control of the vehicle. While, conceivably, an individual who is intoxicated to a level that he is incapable of safely operating a motor vehicle might, through sheer fortuity, drive the vehicle for a short period of time without outward signs of unsafe driving, logic suggests that the probability of doing so decreases as the distance covered increases. That is to say, there must be some point after which a person has driven a vehicle in a "safe" manner where the conclusion that the person is "capable" of safe driving becomes inescapable. Precisely where this distance lies might be a matter of debate. However, in this case, the fact that Appellant apparently drove for a mile or two without any observable indication of an inability to drive the vehicle safely suggests that the he was not intoxicated to a level rendering him incapable of safely operating the mo-

tor vehicle. Indeed, the fact that Appellant was able to keep the vehicle under control while driving fast argues against an inability to drive safely.

¶ 35 Contrast the present case with decisions finding the evidence sufficient to prove intoxication to a degree rendering the driver incapable of safe driving. In *Commonwealth v. McCurdy*, 558 Pa. 65, 735 A.2d 681, 686 (1999), while reviewing a conviction for homicide by vehicle, DUI related, and discussing the DUI component of that conviction, our Supreme Court stated "the Commonwealth presented evidence that McCurdy's intoxication rendered him incapable of safe driving by virtue of his speeding, his failure to control his vehicle on the highway, the resulting accident, his physical instability, and his admission of drinking."

¶ 36 In *Commonwealth v. Leighty*, 693 A.2d 1324 (Pa.Super.1997), we concluded the evidence was sufficient to support a conviction for violation of § 3731(a)(1) where "Appellant admitted to consuming liquor. His eyes were red and glassy. His breath smelled of alcohol. He failed two of three field sobriety tests. And, he was involved in a vehicle accident, albeit minor, only minutes before his arrest." *Id.* at 1327. Similarly, in *Commonwealth v. Rishel*, 441 Pa.Super. 584, 658 A.2d 352 (1995), the evidence was found sufficient to sustain conviction under § 3731(a)(1), where defendant smelled of alcohol, appeared confused, was involved in an automobile accident, failed two field sobriety tests and admitted to consuming two 16–ounce beers.

¶ 37 In *Commonwealth v. Feathers*, 442 Pa.Super. 490, 660 A.2d 90 (1995), *aff'd*, 546 Pa. 139, 683 A.2d 289 (1996), although there was an absence of evidence of erratic or unsafe driving, the overall evidence was found sufficient to sustain conviction under

§ 3731(a)(1), where the defendant had glassy eyes and slurred speech, staggered as she walked, smelled of alcohol and failed field sobriety tests. In *Kowalek*, we also found the evidence sufficient to prove a violation of the statute where there was "uncontradicted evidence that defendant had a strong odor of alcohol about him and bloodshot eyes. More significantly, defendant had difficulty producing his driver's license and registration, had slurred speech and was unable to stand on one foot for more than three seconds." *Id.* at 952. Notably, all of the above cases contained evidence of an inability to drive the vehicle safely, i.e., erratic driving or collision, or other objective evidence of a loss of motor skills, from which it could be inferred that the driver was incapable of safely driving the vehicle. Here, there was none.

¶ 38 Thus, when the evidence is reduced, we have an individual who had consumed alcohol and who provided some strange responses to questions. While Appellant's responses certainly raise questions relating to his mental functioning, it does not establish an inability to operate a vehicle safely. Given the absence of any observations of an inability to keep the vehicle under control or of other diminishment of motor function ability, there is simply no true basis from which it can be concluded that Appellant was under the influence of alcohol to a degree that rendered him incapable of safely operating a motor vehicle. While the Commonwealth is entitled to reasonable inferences produced by the evidence, the evidence does not sufficiently establish that Appellant was incapable of safely operating the motor vehicle. The jury's verdict in this regard represents a leap or assumption that was unsupported by the evidence. Thus, the verdict was the product of impermissible conjecture and speculation.

¶ 39 For the above reasons, while I agree with the Majority as to the disposition of Appellant's third issue, I cannot agree with respect to the challenges to the sufficiency of the evidence to convict for aggravated assault and driving under the influence. Thus, I dissent from that portion of the Opinion. I would reverse the convictions for aggravated assault and driving under the influence and remand for resentencing.