J. S07035/18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| L.D.W., A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.D.W., A MINOR | : | No. 3361 EDA 2017 |

Appeal from the Dispositional Order, August 28, 2017,
in the Court of Common Pleas of Carbon County
Criminal Division at No. CP-13-JV-0000074-2015

BEFORE: BENDER, P.J.E., PANELLA, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED MAY 25, 2018**

L.D.W. (the "Juvenile") appeals from the August 28, 2017 juvenile dispositional order entered in the Court of Common Pleas of Carbon County adjudicating him delinquent and placing him in a residential treatment facility for juvenile sex offenders for delinquent acts constituting the crimes of rape by forcible compulsion, involuntary deviate sexual intercourse by forcible compulsion ("IDSI"), sexual assault, aggravated indecent assault without consent, and indecent assault without consent.[1]  We affirm.

The trial court set forth the following factual history:

> On the evening of August 23, 2015, [J.C. ("Victim"), then 15 years old,] was staying at the house of Marlon Kirk in Lansford, Carbon County, Pennsylvania.  The Victim's mother, [S.T.], was a former girlfriend of Marlon Kirk from whom she had separated in June 2015.  In addition to the Victim and Marlon Kirk, also in the home that evening were

---

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3124.1, 3125(a)(1), and 3126(a)(1), respectively.

[S.T.] and her son, [C.C.], the Victim's brother, as well as the Juvenile, [then 14 years old,] and his mother, brother and sister, [F.S.], [M.K.], and [K.K.], respectively.

[F.S.], who was also a former girlfriend of Mr. Kirk with whom she had several children, was moving into the home that same day from New York with her children. The Victim testified that the morning of August 23, 2015, was the first time she could recall meeting the Juvenile.

Mr. Kirk's home is a three-story home with three bedrooms on the second floor. On August 23, 2015, arrangements had been made for [F.S.] to sleep on the first floor in the living room with her son, [M.K.], and her daughter. Mr. Kirk and [S.T.] slept that night in one bedroom on the second floor of the home; [C.C.] and the Juvenile were to sleep in a middle bedroom on the second floor; and the Victim occupied the third bedroom at the other end of the hall.

That evening, the Victim went to bed sometime between 10:30 and 11:00 P.M. Approximately forty-five minutes later, while the Victim was lying in bed on her side facing the door, the Juvenile opened the bedroom door, entered, and closed the door behind him. The Victim was tired and believes she was most likely using her iPhone when this occurred. Before going to bed, the Victim had taken Trazodone, to help her sleep, and Lamictal for depression and a mood disorder. Both of these medications are prescribed and, according to the Victim, have no side effects.

Upon entering the bedroom, the Juvenile first sat at the foot of the bed for a short period during which time the Victim and the Juvenile spoke briefly. When the Victim began to fall asleep, the Juvenile crawled onto the bed behind the Victim and laid down facing her back. The Juvenile began kissing the Victim on her neck, which offended the Victim, but which she did nothing to stop.

The Juvenile next pulled the Victim's sweat pants and underwear down and began to insert his penis into her rectum. The Victim said nothing at first, she was scared and froze, but as the Juvenile continued and began thrusting and penetrating her anus, the Victim, who was in pain, began crying and repeatedly asked the Juvenile to stop. The Juvenile continued despite these requests, telling the Victim that it would be over soon, and that she should "just keep going with it."

When the Juvenile was finished, he withdrew his penis, grabbed the Victim's hand, and made the Victim touch his penis. After a minute or two, the Victim removed her hand from the Juvenile's penis and the Juvenile again put his penis inside the Victim's rectum and began thrusting, notwithstanding that the Victim was crying, saying "no," and begging him to stop. When the Juvenile finished penetrating the Victim a second time, the Victim needed to ask him to leave several times before he did so. To keep the Juvenile from re-entering the room, the Victim barricaded her door, placing furniture and other items in front of the door to prevent the Juvenile from returning.

At first, the Victim did not tell anyone what had happened, testifying that she was too scared to leave her bed. However, the next day, which was the first day of school, the Victim asked to see her counselor, Kevin Loch, and immediately told him that she had been raped: that the Juvenile had forced his way onto her and engaged in sexual intercourse as she was crying and trying to push him off. Mr. Loch described the Victim as being upset and uncomfortable. Mr. Loch reported the incident to the proper authorities.

That same day at approximately 7:00 p.m., the Victim was taken to the Scranton Child's Advocacy Center (CAC) by her mother, where a sexual assault examination was performed by Cheryl Friedman, a board-certified family nurse practitioner, also

certified as a sexual assault nurse examiner (SANE). As part of a multi-disciplinary team at the Child Advocacy Center, Ms. Friedman's expertise includes conducting physical examinations of the victims of sexual assault and familiarity with the psychological aspects of sexual assault.

In addition to noting scratches on the Victim's back, skin and abdomen during her genital examination of the Victim, Ms. Friedman observed excoriated skin at two areas of the Victim's rectum consistent with the sexual assault described by the Victim. Ms. Friedman testified that the excoriated skin was a recent injury since this area of the body heals rapidly, within several days. Ms. Friedman also noted that the Victim was upset and crying during the examination, and opined that such behavior, as well as the Victim's testimony that she was frightened and froze during the assault and did not scream out, that she blamed herself for what had happened, and that she had nightmares and was depressed for months afterwards was consistent with a young person who had just been sexually assaulted. It was Ms. Friedman's opinion, taking into account the Victim's medical history and description of what had occurred, together with her observations made during her examination of the Victim, that the Victim's behavior was consistent with a sexual assault having occurred.

Trial court opinion, 10/18/17 at 2-6 (citations to notes of testimony omitted).

The record reflects that following a hearing held on July 20, 2017, the trial court adjudicated L.W. delinquent of the above-mentioned offenses. Additionally,

[t]he Juvenile's placement in a residential treatment facility at Abraxas Youth Center Sex Offender Program Secure in Morgantown, Pennsylvania, was

agreed upon by all parties and accepted by the court at a disposition hearing held on August 28, 2017.

An appeal from the disposition order was filed on September 12, 2017. This appeal was accompanied by the Juvenile's concise statement of the matters complained of and to be raised on appeal [pursuant to Pa.R.A.P. 1925(b)].

*Id.* at 2. Thereafter, the trial court filed its Rule 1925(a) opinion.

The Juvenile raises the following issue for our review:

Whether the evidence was sufficient to establish forcible compulsion for the crimes of rape by forcible compulsion and involuntary deviate sexual intercourse by forcible compulsion when the evidence established that [the Juvenile] engaged in anal sex with the victim without her consent but without facts establishing he used any type of force to overcome her will?

Juvenile's brief at 4.

Our standard of review for a challenge to the sufficiency of the evidence is well settled. We must view all the evidence in the light most favorable to the verdict winner, giving that party the benefit of all reasonable inferences to be drawn therefrom. Additionally, it is not the role of an appellate court to weigh the evidence or to substitute our judgment for that of the fact-finder.

*Commonwealth v. Alford*, 880 A.2d 666, 669-670 (Pa.Super. 2005), *appeal denied*, 890 A.2d 1055 (Pa. 2005), quoting *Commonwealth v. Gruff*, 822 A.2d 773, 775 (Pa.Super. 2003), *appeal denied*, 863 A.2d 1143 (Pa. 2004) (citations omitted).

The Crimes Code provides that a person commits rape when "the person engages in sexual intercourse with a complainant [] [b]y forcible

compulsion."  18 Pa.C.S.A. § 3121(a)(1).  The Crimes Code also provides that a person commits ISDI "when the person engages in deviate sexual intercourse with a complainant [] by forcible compulsion[.]"  18 Pa.C.S.A. § 3123(a)(1).

Common to each of these crimes is the element of "forcible compulsion." The Crimes Code defines "forcible compulsion" as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied.  The term includes, but is not limited to, compulsion resulting in another person's death, whether the death occurred before, during or after sexual intercourse."  18 Pa.C.S.A. § 3101.

> It is well-established that in order to prove the "forcible compulsion" component, the Commonwealth must establish, beyond a reasonable doubt, that the defendant "used either physical force, a threat of physical force, or psychological coercion, since the mere showing of a lack of consent does not support a conviction for rape . . . by forcible compulsion." *Commonwealth v. Brown*, 556 Pa. 131, 136, 727 A.2d 541, 544 (1999).   In *Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217 (1986), our Supreme Court stated that forcible compulsion includes "not only physical force or violence, but also moral, psychological or intellectual force used to compel a person to engage in sexual intercourse against that person's will." *Rhodes*, 510 Pa. at 555, 510 A.2d at 1226.  Further, the degree of force required to constitute rape is relative and depends on the facts and particular circumstances of a given case. *Commonwealth v. Ruppert*, 397 Pa.Super. 132, 579 A.2d 966, 968 (1990), *appeal denied*, 527 Pa. 593, 588 A.2d 914 (1991).

***Commonwealth v. Eckrote***, 12 A.3d 383, 387 (Pa.Super. 2010).

Moreover,

> A determination of forcible compulsion rests on the totality of the circumstances, including but not limited to this list of factors:
>
> > the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.
>
> It is not mandatory to show that the victim resisted the assault in order to prove forcible compulsion. Id. The victim's uncorroborated testimony is sufficient to support a rape conviction.

***Commonwealth v. Gonzalez***, 109 A.3d 711, 721 (Pa.Super. 2015) (internal citations omitted).

In considering the totality of the circumstances, the trial court found that:

> [t]he Victim was a minor of tender years. Prior to the date of this incident, the Victim had not met the Juvenile, and had not been involved with him romantically. Yet, without being invited, the Juvenile came unannounced into the Victim's bedroom after she had gone to bed. Adding to the Victim's vulnerability were the effects of the medication she had taken to help her sleep and which caused her to be tired, and her petite size. The Juvenile in contrast is tall and athletic looking, and appeared from his comments to be sexually active and to have had frequent short term relationships with females

because he is easily bored. These physical differences between the Juvenile and the Victim and the Juvenile's attitude toward females are relevant factors to be considered, as are the actions of the Juvenile in removing the Victim's clothing without any prodding or assistance from her, his penetrating the Victim twice without her consent and in the face of her repeated requests that he stop, his placement of the Victim's hand on his genitals, and his insistence on finishing what he had started – his penetration of the Victim – all the while the Victim was in tears and saying "no."

All of this evidences the Juvenile's "domination" and power over the Victim. These facts, combined with the Victim's testimony that she froze, was scared, and didn't know what to do, convinced us that the Victim was compelled to engage in sexual intercourse with the Juvenile against her will through forcible compulsion. While the force used was subtle and to a large extent psychological and emotional, it nevertheless was real and induced the Victim to submit against her will under the totality of the circumstances.[Footnote 2]

> [Footnote 2] That "physical force" was used is evidence by the Victim's statements to Kevin Loc[h], her counselor at school, that the Juvenile had forced his way upon her and engaged her in sexual intercourse while she was crying and trying to push off. As a prompt complaint, these statements are not admissible for their truth or as substantive evidence, ***Commonwealth v. Freeman***, 441 A.2d 1327, 1332 (Pa.Super. 1982), but as an excited utterance, they are. ***Commonwealth v. Pettiford***, 402 A.2d 532 (Pa.Super. 1979). Moreover, no objection was made to this evidence.

Trial court opinion, 10/18/17 at 10-11 (citation to notes of testimony omitted).

Here, we have carefully reviewed the record, and it demonstrates that the evidence admitted at the adjudication proceeding, as well as all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as the prevailing party at the adjudication proceeding, was sufficient to support the forcible compulsion element of the offenses rape and IDSI.

Juvenile dispositional order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/25/18